In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 17-1771 & 17-1777

WILLIAM HURT, DEADRA HURT, and ANDREA HURT,

*Plaintiffs-Appellees*,

*v.*

MATTHEW WISE, *et al.*,

*Defendants-Appellants*.

_____

Appeals from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 3:14-cv-00092 — **Jane Magnus-Stinson**, *Chief Judge*.

_____

ARGUED NOVEMBER 8, 2017 — DECIDED JANUARY 23, 2018

_____

Before WOOD, *Chief Judge*, and FLAUM and HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. Andrea, Deadra, and William Hurt were all arrested after their uncle, Marcus Golike, was found dead on the banks of the Ohio River. The arrests came after Deadra and William "confessed" that they, with some help from Andrea, murdered Golike. But one by one, each was absolved. Andrea was never criminally charged. The charges against Deadra were dropped after four months. And while

the state prosecuted William, he was not convicted on any charge.

With the criminal proceedings behind them, Andrea, Deadra, and William filed a civil suit against the officers and detectives involved in their arrests and prosecutions. Their claims focus on the interrogations of Deadra and William, the decisions to arrest all three plaintiffs, and the alleged fabrication of evidence by the police. All defendants filed motions for summary judgment on the basis of qualified immunity. For the most part, the district court denied the motions. The defendants challenge those rulings in this interlocutory appeal. We conclude that with minor exceptions the district court correctly assessed the situation.

## I

### A

In June 2012 a male body washed up on the Kentucky side of the Ohio River. A state medical examiner's autopsy revealed that the hyoid bone in the neck of the deceased, plus a rib, had been fractured. There were no other visible injuries. She concluded that the injuries were consistent with asphyxia by strangulation.

Zachary Jones and Matthew Wise of the Kentucky State Police ("KSP") initially took the investigatory reins. They found two items in the front pocket of the man's pants: a letter, enclosed in a plastic bag, from the Social Security Administration addressed to Marcus Golike, and a folded baseball cap. The police soon confirmed that the body was indeed that of Golike, a resident of Evansville, Indiana. At that point the Evansville Police Department ("EPD") and EPD

detective Jeff Vantlin assumed primary responsibility for the investigation. Jones and Wise continued to assist.

The Evansville detectives learned that Golike had last been seen at the home of Debbie Hurt, Golike's foster sister and Andrea's, Deadra's, and William's mother. Vantlin went to Debbie's home, where he spoke separately with Debbie and William. At the time, William was 18 years old.

Debbie told Vantlin that Golike had been at her house the night before his body was found. She had made dinner for him, but went to bed before he left. She recalled that it was a Saturday night, and that William and Golike had stayed up playing chess. Vantlin next spoke with William, who corroborated the basic facts, but at first said that the events Debbie described had taken place a few days earlier, on Thursday. When confronted with the discrepancy in dates, William agreed that Debbie might have been correct. Vantlin also observed that William's hand was swollen and freshly scratched. William explained that the swelling was the result of having punched a tree, and that he sustained the scratches while scooping ice cream at work. Vantlin later visited the ice cream store where William worked and verified the existence of the exposed rods on which William said he had scraped his hand.

A week later, Jones, Vantlin, and Wise returned to the Hurts' home, where Jones interviewed William. Jones suspected that William knew more about Golike's death than he was admitting, and so he accused William of not being forthcoming. When asked, William expressed doubts about his ability to pass a polygraph, but he said that he was willing to try.

The same day, the officers visited Golike's brother and informed him that Golike's body had been found in the river. The brother immediately asked, "Is it verified he was killed, other than jumping off a bridge? Because he has been on that bridge three times before threatening to kill himself." Golike had been diagnosed with paranoid schizophrenia and had been released from prison just days before his death. In prison, he had been on suicide watch. It is not clear when the detectives learned of Golike's full psychological history.

While the officers were interviewing Golike's brother, Debbie called Vantlin and said that Harley Wade, a foster son who had moved in with her not long before, had recently choked her to the point of nearly losing consciousness. She wondered if Harley might be involved in Golike's death. The officers wanted to interrogate Harley, but they dropped that idea when they learned that Harley was a ward of the state and could not be questioned without an attorney present. Instead, they switched their attention back to William and asked Debbie to bring William to the station for questioning.

Debbie complied with this request. Once William was at the station, Jones and Vantlin took him to an interrogation room, where they read the *Miranda* warnings and William signed a waiver of his rights. The two officers grilled him for roughly four hours. The interrogation took place in two parts: a one-hour session, punctuated by a 40-minute break, and then a two-and-a-half hour session. The entire interrogation was video-recorded.

During the first hour, William repeatedly gave a consistent account of what happened the Saturday night before Golike's death. He told the police that after he and Golike played chess, Golike left the house and William never saw

him again. But each time, Jones and Vantlin told William that he was a liar. They insisted that they knew William was involved in Golike's death, that they already had enough information to put him in jail, that William was not "telling [Jones and Vantlin] what [they] need to hear," and that his continuing to tell the same story could not change their minds. All the while, Jones and Vantlin introduced details about the suspected crime. For example, they asked William about what may have happened at the river, whether Golike was wearing a hat, whether Golike had been tied up, whether Harley was the primary culprit, and whether Golike had been choked. William became visibly upset during parts of the interrogation, crying and hitting himself on the head.

After the break, Jones and Vantlin asked William if he had done any "soul-searching." William said that he had, and he again offered the same account he already had provided several times. Jones and Vantlin brushed it aside, calling William a liar and repeating that he was not telling them "what [they] need to hear." Jones told William that he needed to tell the truth, and he made it clear what he meant by that: "we're [*i.e.*, Jones and Vantlin] the ones that determine if you're lying or not. So far, we've both determined you're lying." Jones added that if William did not tell the "truth," he faced a fate "worse than prison."

William eventually broke. He "confessed" that he, Andrea, Deadra, and Harley were responsible for Golike's death. He told Jones and Vantlin that after the chess game, he got in the family van with his siblings. As they drove along, they spotted Golike by the roadside. They stopped and got out of the car, and Harley started joking around with Golike. But Harley got out of control (for unexplained reasons) and

started punching and choking Golike. William said that he got a few punches and kicks in as well. They then tied Golike up in bed sheets and put him in the van. Deadra drove to Dress Plaza, Evansville, where they dumped Golike's body into the Ohio River. On the way back from the river, they stopped at the Kangaroo, a convenience store, to buy some snacks using Golike's debit card.

William's "confession" was replete with easily verified and contemporaneous evidence of inaccuracy and unreliability. When William offered any detail about the death, he prefaced it with phrases such as "I'm drawing clues together," "the way you're telling me," "like you were saying," or "from what you've told me." At other times, he responded to the officers' questions by guessing until they signified that they were satisfied. Finally, at the conclusion of the interrogation, William asked Jones, "Was I getting close to most of the facts of what actually happened?" Jones said he did not know, and William again asked, "Was I close to it?" Instead of following up, Jones left the room.

Several critical "facts" that William offered were facially impossible. For example, if William's account of where he and his siblings had dumped Golike's body—Dress Plaza—was true, the body would have had to float *upstream* four to six miles to have arrived at the location where it was found. There was no physical evidence that Golike had been beaten or tied up, and it later turned out that Golike's debit card was not, and could not have been, used at the Kangaroo, because there was only $0.08 in the account at the relevant time.

William provided only three facts that were even potentially original. Of the three, two could just as easily have been common-sense guesses: which pocket Golike's hat was in

when his body was found, and how Harley might have used his thumbs to strangle Golike. The third "fact" is actually nothing of the sort. William at one point said that Golike's hat had been "folded" in Golike's pocket—evidently the right answer—but at other times he says it was "shoved" in the pocket. (We wonder how many teenaged boys observe the difference between folding and shoving.)

William was arrested following his interrogation. The *only* source of probable cause to arrest him was the confession, and so everything turns on it. Deadra, who was 19 at the time, was also arrested following William's "confession," after Jones, Vantlin, Wise, and a now-deceased EPD detective interrogated her the same night. She too was read the *Miranda* warnings and signed away her rights. Her interrogation lasted nearly two hours and was also recorded.

Deadra's interrogation followed the same script as William's. Sobbing for much of the time, Deadra denied involvement in Golike's death. She was immediately accused of lying. Wise told her that her story "ain't gonna work." Jones added that William already had implicated her, and he fed her the details of William's "confession." Jones told Deadra that unless she talked, her whole family was going to jail. For Deadra, he envisioned "at least 25 to 50" years "behind bars." He continued that the only way she was going to save anyone in her family was to tell the truth. If she did not, Jones told her, she was "going to hang."

Deadra struggled to satisfy the officers. She said at one point "I don't know what I'm supposed to tell you." On multiple occasions Vantlin answered that question for her: tell the same story that William did. Like William, Deadra eventually repeated the facts that the detectives had fed her and guessed

at answers until she placated them. She finally succeeded in
doing so, telling the officers that she drove the van that the
siblings used to take Golike to the river. Shortly after "con-
fessing," however, Deadra appeared ready to back-track. At
that point, Jones abruptly ended the interrogation and said,
"Now you're starting to recant your story, so what we're go-
ing to do is we're going to stop. We've got enough. We're just
going to stop the interview. Okay? Because now you're trying
to recant your story, trying to add things into it."

Based on William's and Deadra's interrogations, the de-
tectives also arrested Andrea, who was 16 at the time. She was
interrogated, but because all defendants, some in the district
court and the rest on appeal, concede that she was arrested
prior to her interrogation, her experience is not decisive for
any of the issues on appeal. It appears that Harley was also
indicted, but the charges against him were dismissed at the
same time as those against Deadra. He is not a party to this
case.

After the interrogations, the detectives followed up in a
few minor ways. EPD detective Jack Spencer filed a report
four days after the sessions with Deadra and William; in it, he
claimed to have taken William to identify the location where
Golike's body was dumped in the river. William denies that
this ever happened. Vantlin looked into Golike's bank
statements and learned that the last charge on Golike's debit
card was made two days prior to his disappearance. That was
when he learned that the balance in the account was a meager
$0.08. This information undermined William's "confession"
insofar as it revealed that no one (including William) did or
even could have used Golike's debit card to make any
purchases at the Kangaroo on the night in question. Vantlin

also met with the clerk who was working at the store that night. The police summary of the interview says that the clerk confidently identified Andrea and Deadra in a photo array, and that she said Harley and a fourth male (not William) looked familiar. But that summary omitted the most important details. In a declaration submitted to the district court, the clerk said that she also told police that she did *not* remember any of the identified people having come into the store and that she may have recognized the faces from watching the news. Several months later, EPD officers William Arbaugh and Jason Pagett filed a police report asserting that William had made incriminating statements to them when he was being transported after his interrogation. William says that this too was fabricated.

Andrea was held for seven days before being released without charges. Deadra and William were both charged with murder, among other crimes. Deadra remained in jail for four months, at which point the state court granted a motion to suppress her "confession" and charges against her were dropped. William stayed in jail for eight months before his trial. The jury did not convict him on a single count.

B

Following this series of events, Andrea, Deadra, and William filed a 14-count federal complaint alleging multiple constitutional and state-law violations. The complaint named as defendants Jones and Wise ("the KSP Defendants"), Arbaugh, Pagett, Spencer, and Vantlin ("the EPD Defendants"), and the state medical examiner. Each set of defendants filed a motion for summary judgment, seeking qualified immunity or outright dismissal of the case. The district court granted the state medical examiner's motion in

full, and it granted the other defendants' motions on all state-law grounds. The district court also granted summary judgment in favor of those of the individual EPD Defendants and KSP Defendants who were not personally involved in the allegedly unconstitutional conduct. Finally, it found that material factual disputes precluded qualified immunity for most of the Hurts' federal claims. That left the following claims:

- Andrea's, Deadra's, and William's Fourth Amendment false arrest claims against Jones, Vantlin, and Wise.
- Andrea's, Deadra's, and William's claims that the KSP and EPD Defendants failed to intervene to prevent the unconstitutional conduct and conspired to violate their constitutional rights.
- Deadra's and William's claims against all the EPD Defendants based on the allegedly fabricated evidence.
- Deadra's and William's due-process claims against Jones, Vantlin, and Wise based on the allegedly co-erced confessions.

Each defendant appeals the denial of qualified immunity from each claim still pending against him.

## II

Before we can consider the merits of any of the defendants' arguments, we must be assured of our jurisdiction to do so. Ordinarily, interlocutory decisions such as the denial of summary judgment are not subject to appellate review. 28 U.S.C. § 1291. Yet there is a limited exception for defendants who were denied qualified immunity on summary judgment. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Review of such an interlocutory decision is proper if, and only if, the defendant

presents a purely legal question for this court to review. *Id.* Any material factual point that is genuinely contested is outside our jurisdiction. *Johnson v. Jones*, 515 U.S. 304, 313 (1995); see also *Whitlock v. Brueggemann*, 682 F.3d 567, 573 (7th Cir. 2012) ("We have jurisdiction to consider the merits of these appeals only to the extent that they turn on legal rather than factual questions.") (citations and internal quotation marks omitted). The defendant may accept, for purposes of the qualified immunity inquiry, the facts and reasonable inferences favorable to the opponent of immunity, and argue that *those* facts fail to show a violation of clearly established law. *Gutierrez v. Kermon*, 722 F.3d 1003, 1009 (7th Cir. 2013).

The defendants here have tried to take the latter approach, but they have not quite succeeded. Rather than fully accepting the facts in the light most favorable to the plaintiffs, the EPD and KSP Defendants, relying on *Scott v. Harris*, 550 U.S. 372 (2007), have asked us to revisit the inferences that the district court found could reasonably be drawn from Deadra's and William's recorded interrogation. That we cannot do without going beyond our jurisdiction on this interlocutory appeal. Nothing in *Scott* undermines this point.

In *Scott* the district and appellate courts, faced with a qualified immunity defense, had refused to take into account a video and instead had accepted the plaintiff's account of a car chase. On that basis, they concluded that the defendant police officer was not entitled to qualified immunity. 550 U.S. at 376. After reviewing the video, however, the Supreme Court reversed. *Id.* at 379–81. Uncontestable dashboard footage showed that the fleeing driver was speeding, swerving through lanes of traffic, and running red lights, all while pedestrians looked on. *Id.* The Court ruled that if one account of

the facts "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. That aptly described the situation in the case before it, and so the Court concluded that the district court should have taken the video into account. *Id.* at 380–81.

*Scott* does not treat video footage as a distinct type of evidence that is not subject to the normal summary judgment strictures. It holds only that a factual account should not be credited when the record contains evidence that is flatly contradictory to that account. If the question is whether someone was driving recklessly, video evidence showing a high rate of speed, use of the oncoming traffic's lane, and running red lights is plainly relevant. If instead the question is what a person meant in a videotaped interview, we are back in the land of inferences that must be taken favorably to the opponent. Courts applying *Scott* have understood this distinction. See, *e.g.*, *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) (relying on video from a dashboard camera rather than the non-moving party's account because it clearly depicted the physical confrontation in question); *Rivera v. Jimenez*, 556 F. App'x 505, 507 (7th Cir. 2014) (relying on prison video of a scuffle rather than non-moving party's account because it "discredit[ed] the plaintiff's version of events"). *Scott* did not create a *per se* rule that video evidence is always subject to an appellate court's independent assessment.

Indeed, nothing about video evidence justifies placing it in such a privileged position. See *Stinson v. Gauger*, 868 F.3d 516, 523 (7th Cir. 2017) (*en banc*) (noting that *Scott* did not overrule *Johnson* and characterizing the issue in *Scott* as about

officer conduct in light of depicted facts). And not all disputes are about what events transpired. Sometimes the availability of qualified immunity turns on the inferences that are permissible in light of the historical facts. See, *e.g.*, *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993) (observing that different conclusions can be reached about the existence of probable cause based on either "the facts or the reasonable inferences to be drawn from them"). Where the parties disagree about inferences, the fact that evidence is found in a video is not important—the purpose of the evidence is what matters.

The video evidence of William's and Deadra's interrogations does not portray the kind of uncontestable facts that were before the Court in *Scott*. It is no more and no less than a record of an interrogation, and so we review it just as we would have if the interviews had been audiotaped, recorded by a stenographer, or reduced to affidavits. We therefore turn to the defendants' qualified immunity motions using the facts and reasonable inferences in the light most favorable to the Hurts. We leave the final resolution of these issues to the trier of fact, should the case get that far.

**III**

Once a defendant asserts qualified immunity, the plaintiff can proceed only if she can show two things: first, that the "facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right," *Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2017), and second, that the right was "clearly established at the time of the alleged violation," *id*. Moreover, the plaintiff cannot rest on glittering generalities: her showing must be grounded in the particular context in which the problem arises. We review *de novo* the

district court's denial of qualified immunity. *Green v. Newport*, 868 F.3d 629, 632 (7th Cir. 2017).

A

We begin with the false arrest claims. A claim of false arrest is an allegation that a plaintiff was arrested without probable cause, in violation of the Fourth Amendment. *Gutierrez*, 722 F.3d at 1007–08. Probable cause is an absolute defense to such a claim. *Id.* Whether probable cause existed at the time of the arrest depends on the totality of the circumstances. *Id.* at 1008. Even if, in hindsight, it appears that probable cause was lacking, qualified immunity is still available if the arresting officers "reasonabl[y] … could have believed the arrest to be lawful, in light of clearly established law and the information the arresting officers possessed." *Id.* (citations and internal quotation marks omitted). This is often called arguable probable cause.

The district court found that Jones, Vantlin, and Wise were not entitled to qualified immunity from the false arrest claims because there were material factual disputes bearing on the question of arguable probable cause. For example, the court noted, a jury might conclude that Golike committed suicide (since he had threatened suicide before, and he had targeted the bridge near which he was found), that Deadra's and William's "confessions" are unreliable (because almost all of the facts were either fed to them or the result of guesswork), that some of the evidence against the Hurts was fabricated (William's supposed identification of the drop-off spot and his alleged incriminating remarks), and that physical evidence conclusively undermined William's "confession" (since Golike's body was found upstream of the alleged drop-off spot, and inert objects would drift downstream, not

upstream). Assuming that the disputes over those facts were resolved in the Hurts' favor, the case for even arguable probable cause to arrest any of the three Hurts falls apart.

Jones, Vantlin, and Wise push back with three arguments. First, they insist that there was at least arguable probable cause to arrest the three based on Deadra's and William's "confessions" because neither of those confessions was coerced. We will say more about coercion when we discuss the Fifth Amendment issue presented in this case. For now, however, we note that this argument is misplaced with respect to a Fourth Amendment false-arrest claim. Reliability, not coercion, is the gravamen of probable cause. See *Illinois v. Gates*, 462 U.S. 213, 230 (1983) (listing "veracity," "reliability," and "basis of knowledge" as highly relevant in determining the value of a witness's statement); *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (probable cause ordinarily exists when there is "reasonably trustworthy information" that a suspect committed a crime). A confession may have been cajoled out of a suspect in a non-coercive way, yet still be "worthless as evidence, and as a premise for an arrest." *Aleman v. Village of Hanover Park*, 662 F.3d 897, 906–07 (7th Cir. 2011). This rule makes sense. An officer could sit in a room with a cooperative suspect and could politely ask that person to repeat everything the officer says. The suspect could oblige, even if the story he has been asked to parrot is a confession to a crime. Nothing about the witness's statement has been coerced, but by the same token nothing qualifies it as a reliable confession. That is not to say that coercion is completely irrelevant: to the contrary, the existence of coercion informs reliability even though it is not determinative. But the key inquiry for the Fourth Amendment remains reliability, not coercion.

The EPD Defendants also confuse these concepts when they argue that Deadra and Andrea do not have standing to challenge the reliability of William's "confession." Neither Andrea nor Deadra is asserting a constitutional right on William's behalf when each argues that William's interrogation did not give the police reliable evidence that she was involved in Golike's death. Each makes the straightforward assertion that the police used flimsy information to arrest *her*.

Both sets of defendants also take issue with the legal standard they understand the district court to have applied. By their reading, the district court found that the disputed facts revealed an absence of probable cause, but not necessarily the absence of arguable probable cause. This argument is meritless. Defendants fixate on one line in which the district court wrote "if the jury credits evidence Defendants cite, it could reasonably conclude … that it was objectively reasonable for officers to believe probable cause to arrest [William] existed." If that belief is objectively reasonable, they urge, then there must have been at least arguable probable cause. But all the district court was saying was that it would be objectively reasonable to believe probable cause existed *if* the evidence is viewed in the defendants' favor. At this stage, that is the wrong perspective. Taking the inferences in the Hurts' favor, a jury could reasonably conclude it was objectively unreasonable for an officer to have believed there was probable cause. The district court included an explicit discussion of arguable probable cause in its opinion, and it went on to apply that standard faithfully.

Essentially, all of the defendants are asking us to reweigh the evidence available to the Hurts, including the filmed interrogations, and to come to an independent conclusion about the existence of arguable probable cause. That is plainly inappropriate: we do not sit to resolve disputed issues of fact, nor do we have appellate jurisdiction over those issues.

B

Another theory the Hurts advance is that the defendants failed to intervene against violations of their constitutional rights and conspired to violate those rights. Both of these theories require plaintiffs to show an underlying constitutional violation. *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017). The failure-to-intervene claim also requires them to prove that the defendant knew of the constitutional violation and that he realistically could have prevented it. *Id.* For the conspiracy claim, plaintiffs must also demonstrate that the defendants agreed to inflict the constitutional harm. *Sow v. Fortville Police Dep't*, 636 F.3d 293, 304–05 (7th Cir. 2011).

The district court denied the defendants' motions for summary judgment on both of these theories. It ruled that, taking the disputed facts favorably to the plaintiffs, there were possible constitutional violations. It added that the presence of an agreement between defendants could be inferred because they extracted and used unreliable confessions to arrest Andrea, Deadra, and William, and fabricated evidence against them despite the evidence pointing to suicide as the cause of death. Each defendant individually took part in the interrogations or fabrication of evidence. All were thus aware of the constitutional violations, yet none intervened.

Only the EPD Defendants appeal the denial of qualified immunity from these claims. They argue that the failure-to-intervene and conspiracy claims fail because no plaintiff was deprived of a constitutional right. We find no merit in this position. As we already have pointed out, a trier of fact could conclude that Andrea, Deadra, and William were arrested without even arguable probable cause, and thus in violation of the Fourth Amendment.

The EPD Defendants also urge that there was no evidence that any officer had an opportunity to prevent the constitutional violations. They contend that defendants Arbaugh, Pagett, and Spencer could not have stopped the false arrests because none was present at the moment of arrest. Perhaps this position would have had some merit before the Supreme Court decided *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017), but it no longer does. *Manuel* held that the Fourth Amendment protects not only against an initial arrest without probable cause, but also continued detention in its absence. *Id.* at 918–19. It is plausible to infer from each defendant's creation of false evidence that he was aware that the continuing incarcerations were unsupported and could have done something to stop them. The EPD Defendants would also like to argue that none of them knew that they were fabricating evidence and that the confessions were riddled with problems. But those arguments must await trial, as they turn on disputed facts.

With respect to the conspiracy theory, the EPD Defendants take the position that no trier of fact could find, on this record, that there was an agreement to violate the Hurts' constitutional rights. They stress that the Hurts "admitted" in their depositions that they have no *affirmative* evidence of such an agreement. But there is competent circumstantial evidence of

an agreement, and there is nothing wrong with circumstantial evidence. At this stage, we have no authority to decide whose evidence of agreement is more persuasive.

C

Deadra and William are also pursuing claims that they characterize as based on "malicious prosecution." For this purpose they are suing only the EPD Defendants. We said in *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001), that there is no free-standing constitutional tort of malicious prosecution, though there are other constitutional rights (*e.g.,* such as those under the Due Process Clause and the Fourth Amendment) that protect people against abusive arrests, fabrication of evidence, etc. While *Manuel* rejected some aspects of *Newsome*'s holding, nothing in *Manuel* changed the general rule that the federal constitution does not codify state tort law. But in this case, the fact that the plaintiffs have used the terminology "malicious prosecution" is of no moment. What matters is whether they have identified the constitutional right at issue, and they have done so. The Fourteenth Amendment's Due Process Clause is the relevant constitutional source; it forbids the state from depriving a person of liberty (including by pre-trial detention) based on manufactured evidence. *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017); see also *Alexander v. McKinney*, 692 F.3d 553, 557 (7th Cir. 2012) (distinguishing pre-trial release on bond, which is not a deprivation of liberty, from pre-trial confinement, which is); *Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000) (eight months of pre-trial detention was a deprivation of liberty). As the EPD Defendants conceded in their reply brief, this type of due process claim can be based on false police reports. See *Whitlock*, 682 F.3d at 580 (using

false evidence to deprive a defendant of liberty "in some way" violates the Due Process Clause).

The EPD defendants urge us to reverse the district court's denial of qualified immunity from these claims because the false police reports did not cause the deprivation of either William's or Deadra's liberty. But if William and Deadra can show that the fabricated police reports furthered the prosecution, they have done enough. See *Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013) (including as evidence of causation for the constitutional violation "actions the agents took after Alexander's arrest to further the prosecution, which included testifying in depositions and at trial and intimidating a potential defense witness").

With respect to William, all of the EPD Defendants accuse the district court of misjudging the facts that relate to causation. They note, accurately, that the reports were not used for the arrests or at William's trial. From that, they reason that the reports also contributed nothing to William's pre-trial detention. That conclusion, however, does not follow from the premise. The police went to some trouble to create the falsified reports. Had they not done so, it is reasonable to assume that William would have been released promptly. Though the "confession" may have been the focal point of the case against William, the prosecution might have ended sooner if the state knew that most of the seemingly inculpatory information at its disposal was fabricated or impossible.

Deadra's claim against EPD Defendants Spencer and Vantlin tracks William's, but her claim against defendants Arbaugh and Pagett is different. Deadra alleges that the latter two defendants fabricated a report on February 14, 2013. At that time, William was still in custody, but Deadra was not:

she had been released on October 30, 2012. She raises no other allegations against Arbaugh and Pagett about anything they might have done to deprive her of liberty. We thus conclude that they are entitled to qualified immunity from Deadra's claim based on fabricated evidence.

D

Last, we address Deadra's and William's Fifth Amendment claims against Jones, Vantlin, and Wise. The district court denied qualified immunity with respect to both their procedural claim based on the use of an involuntary confession in a criminal proceeding and their substantive due process claim based on conscience-shocking interrogation tactics.

We can be brief about the substantive due process argument: it should have been winnowed from the case. The bar for "conscience-shocking" is very high; these interviews may have been abusive, but nothing extreme enough to invoke substantive due process occurred. We note as well that this theory adds little to the case. When there is an alleged violation of a specific constitutional provision, that provision should guide the court's analysis. See *City of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998).

That leaves the Hurts' procedural challenge to the use of their involuntary confessions. Introducing an involuntary confession in a criminal prosecution violates the protection against compelled self-incrimination. *Miller v. Fenton*, 474 U.S. 104, 109–10 (1985). Vantlin raises two preliminary legal arguments, which if accepted would entitle all three defendants to qualified immunity. First, he argues that Deadra's confession was never introduced against her in a criminal trial, and so she was never compelled to testify against herself. We have

already rejected such a cramped understanding of what it means to "use" a confession against someone in a criminal case. See *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1026–27 (7th Cir. 2006) (finding that a confession is used in a criminal case if it is introduced at a probable cause hearing, a bail hearing, or an arraignment). It is enough that the statement was used against Deadra in a probable cause affidavit and in a pretrial hearing.

Vantlin also argues that William voluntarily came to the police station for his interrogation and was not formally arrested until after the interrogation. This means, Vantlin says, that William's interrogation was not custodial and the Fifth Amendment does not apply. That argument jumps over too many steps. Custody and coercion are two separate things. It is true that custodial interrogation is presumptively coercive and requires that the suspect be given adequate procedural safeguards—that is the genesis of the *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966). But a confession can be involuntary even if the suspect is not in custody.

Another problem with Vantlin's argument is that the district court never said that William was not in custody during his interrogation. It said only that William came to the station voluntarily. That says nothing of the circumstances surrounding his interrogation. Whether a person is in custody depends on the objective surrounding circumstances. *Stansbury v. California*, 511 U.S. 318, 323 (1994). A suspect does not have to be arrested formally to be in custody. *Id.* at 322–23. Here, after William voluntarily came to the police station, he was taken by himself into a small room in the station, read the *Miranda* warnings, and was not free to go during his four-

hour interrogation, during which Jones and Vantlin accused him of murder. The district court was well within its rights to consider this as a custodial interrogation. See *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996) (listing factors indicative of custody).

Jones, Vantlin, and Wise's more serious defense is that they had no reason to think that the confessions were not voluntary. The voluntariness of a confession depends on the totality of circumstances, including both the characteristics of the accused and the nature of the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). If those circumstances reveal that the interrogated person's will was overborne, admitting the resulting confession violates the Fifth Amendment. *Miller*, 474 U.S. at 116.

Police coercion is a prerequisite to finding any confession to be involuntary. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986). Physical abuse may be the ultimate coercion, but the Supreme Court has long acknowledged the potency of psychological coercion as well. See, *e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) ("[C]oercion can be mental as well as physical, and … the blood of the accused is not the only hallmark of an unconstitutional inquisition." (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960)); *Miller*, 474 U.S. at 109 (confessions procured by either physical or psychological torture can be "revolting to the sense of justice" and thus inadmissible); *Miranda*, 384 U.S. at 448 ("[W]e stress that the modern practice of in-custody interrogation is psychologically rather than physically oriented").

Often psychological coercion is the consequence of the cumulative effect of subtle tactics. Other times, coercion is obvious. For example, it is clearly established that police

threats against the suspect or the suspect's family are a form of psychological coercion that renders a confession involuntary. See, *e.g.*, *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (confession was involuntary because it came after police threatened to cut off aid that the suspect used to care for her child); *Rogers v. Richmond*, 365 U.S. 534, 543–45 (1961) (a confession was unconstitutionally obtained because it came after police threatened to arrest the suspect's wife); *Sornberger*, 434 F.3d at 1023 (an allegation that police threatened to call the Department of Children and Family Services and recommend removing the suspect's children if she maintained her innocence created a material dispute about whether a confession was voluntary).

Whether police have employed sufficiently coercive tactics to render a confession involuntary is a legal question. *United States v. D.F.*, 115 F.3d 413, 417–19 (7th Cir. 1997). But the answer depends on underlying historical facts. *Miller*, 474 U.S. at 112. Here, had the defendants accepted all historical facts favorably to the Hurts and argued that those facts did not show that either Deadra's or William's confession was involuntary, we would be in a position to answer the ultimate legal question. But once again, they have not. The relevant factual background is what distinguishes the present case from *Dassey v. Dittmann*, 877 F.3d 297 (7th Cir. 2017) (*en banc*). In *Dassey*, the facts were firmly established by the state courts, and our only role was to decide whether the state courts had strayed so far from a rational conclusion that habeas corpus relief was warranted. We ruled that the demanding standard set by 28 U.S.C. § 2254(d) had not been met. *Id.* at 312–18. The present case, a civil one under 42 U.S.C. § 1983, involves no

such deference to the state defendants' position; to the contrary, at this stage we must give the plaintiffs the benefit of the doubt.

Despite intimating at times that the question whether a confession is voluntary is one of fact, the district court in the end properly treated it as a legal issue informed by a series of historical facts. It relied on a number of critical facts to support its conclusion that Jones, Vantlin, and Wise were not entitled to qualified immunity. Key among them was the fact that the interrogators had threatened both Deadra and William.

For Deadra, the district court found evidence of three possible threats. She was told that if she did not tell the truth she was going to spend 25–50 years behind bars. Later, the stakes increased and she was told she was "going to hang" if she did not tell the truth. She was also told that if she did not talk, her whole family, including her uninvolved mother, would go to jail. Jones even counted everyone out for her, saying, "There's one, two, three, four, five of you, all of you's [*sic*] going to jail for murder."

Similarly, William was told that he faced a "fate worse than prison." No defendant concedes that Deadra and William may have heard these statements as threats. Instead, they ask that we disregard the district court's recognition that these statements either could have been or were understood as threats. But we cannot do that. A trier of fact could find coercion in the face of such grave threats, and that is enough to preclude immunity at this stage.

E

False confessions are a real problem, as both the majority and dissenting opinions in *Dassey* recognized. See 877 F.3d 317–18 (majority opinion); 877 F.3d at 331–32 (Rovner, J., dissenting). Even though William and Deadra "confessed," if a trier of fact could conclude that the officers knew that the confessions were false, then the officers are not entitled to qualified immunity for their actions.

We acknowledge, as we did in *Dassey*, that "[t]he Supreme Court's many cases applying the voluntariness test have not distilled the doctrine into a comprehensive set of hard rules." *Id.* at 303. Nonetheless, when the facts must be taken in the light most favorable to the plaintiffs, and when an interrogation is infected with numerous problems, a full trial may be necessary before a final characterization of the process is possible.

This is not the place for an in-depth look at psychological coercion and false confessions, because we are not charged with making the final decision on the admissibility of William's and Deadra's statements. We must decide only whether, taking the facts and inferences favorably to the plaintiffs, any reasonable officer would have known that he was applying impermissible pressure. The district court concluded that the answer to this more limited question is yes, and we agree with it. We first offer a few examples from William's interrogation, which was permeated with coercive tactics and fact-feeding, even as all of his attempts to tell the truth were brushed aside:

> Jones: You're lying, you're—you know, you're lying about something. That's why we keep grilling you

about it, to get if off your chest, to make you feel better, to help our investigation, you know. We'll deal with whatever later. But right now, we're dealing with this and what we're dealing with is your lying, your inconsistent stories. And there's only one way to solve it … .

At the same time as William's account was being dismissed as a lie, he was being told that if he had given the "right" story all along, the interrogation would have ended much sooner:

> Jones: Now, if I had asked you right off the bat everything that you had and you told us verbatim, everything else, you know, and all the right stories … . We'd have been done a long time ago. But we've not heard the truth yet. Not yet.

Jones made it clear to William that he and Vantlin were the ones who would decide if William told the "right" story:

> Jones: I mean, all that you need to do is tell the truth, exactly the truth, and we're the ones that determine if you're lying or not. So far, we've both determined you're lying.

It was bad enough for the officers to threaten William that if he did not change his story that he was "an evil son of a bitch" or looking at a "fate worse than prison." Worse, Jones told William that none of the pain was "going to go away until you tell me the truth" and that William had "not felt pain yet." Jones warned that he could "keep turning the pain on, [] keep turning it on, [] keep turning it on." When William told Jones that he was struggling to breathe, Jones responded: "You're having a hard time breathing … . You're doing this to your-

self … . I don't have a—you know, a lighter sitting here burning you, but you're feeling like you're on fire. You know what we want to hear. We don't want to hear all that other stuff. You know what we want to hear."

All the while, Jones and Vantlin basically drafted the entire confession by feeding William every critical fact through suggestive questioning. The following example is illustrative:

Jones: Where did he choke him at and where did this take place at? Come on, man, you—I know you remember.

William: It had to have been down by my house.

Jones: Yeah.

William: You said that we had the van. So it wasn't that far away from my house.

Jones: Did Mark leave and then you guys got in the van and chased him down or what?

William: When he left, I went downstairs and I laid down. Then, I don't know what else happened.

Jones: You do. You've already told me what's happened. Where did you guys beat up Mark at?

William: Was it on Boeke and Riverside?

Jones: Not—No, don't ask me. Where did you beat up Mark at?

William: The Kangaroo?

Jones: Was it at the Kangaroo?

William: You said you had my face on a videotape. You said that if—

Jones: Where did you beat up Mark at?

William: It had to be by the—by my house because we couldn't have—he couldn't have gotten that far by the time I had gone downstairs.

Deadra's interrogation follows the same pattern. From the start, the officers called Deadra a liar each time she denied her involvement, and they told her that she could help herself only if she stopped lying. For her, the risk of holding her ground was that she was "going to hang" and that her whole family was "going to jail for murder." The defendants also told her that no matter what she said, she was going to be charged with murder. Simultaneously, they minimized her moral guilt. Wise said things such as "I'm not saying that you—you ended his life" and "I'm not saying you're a killer, I'm just saying that you—you drove the van." This was designed to prime Deadra to confess. The officers also told her what William had supposedly confessed to, and insisted that she repeat the same story for them. She had trouble doing that, but they never let up.

On the basis of this record, a trier of fact could find that the officers deliberately coerced confessions from William and Deadra. The rule forbidding such conduct has been established for decades. Perhaps, as the officers argue in their briefs, a trier of fact might come to the opposite conclusion and think that they were pushing, but doing nothing that crossed a constitutional line. It is not for us to resolve that question. It must await further proceedings.

IV

The district court's summary judgment ruling is REVERSED with respect to Deadra's malicious prosecution claim against defendants Arbaugh and Pagett. We also conclude that the district court should have eliminated the substantive-due-process theory. In all other respects, insofar as we have jurisdiction to act here, we AFFIRM the order of the district court denying qualified immunity to the defendants.