NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued September 13, 2018
Decided November 26, 2018

**Before**

JOEL M. FLAUM, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

No. 18-1741

| | |
|---|---|
| CORALYNN E. WHITE,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>JOSEPH JAMES FITZPATRICK, *et al.*,<br>*Defendants-Appellees*. | Appeal from the United States District Court for the Southern District of Illinois.<br><br>No. 3:17-cv-00087<br><br>J. Phil Gilbert,<br>*Judge.* |

**O R D E R**

Coralynn White was charged with battery, but a jury found her not guilty. She asserts that Officer Thomas Wuest and Sergeant Mark Berndsen of the Breese, Illinois, Police Department falsely charged her with assaulting Joseph Fitzpatrick, the father of her child, to bolster Fitzpatrick's position in a custody hearing. White further alleges that Fitzpatrick, his wife Amber, and their neighbor, Jay Staser, conspired with the officers. White brought a Section 1983 action against the officers, the City of Breese, Fitzpatrick, Amber, and Staser asserting violations of the Fourth and Fourteenth Amendments. She also brought various state law claims against the individual defendants (including claims for malicious prosecution and false arrest) and a *Monell* claim against the City of Breese.

The district court granted summary judgment in favor of defendants, and White appeals. For the reasons stated below, we affirm.

## I.

White and Fitzpatrick had a child together and lived together for a brief time after the child was born, though they were never married to each other. In June 2015, White had primary custody of their then-six-year-old child, G.F., who visited Fitzpatrick every other weekend. The couple had custody disputes at various times including in June 2015.

On Sunday, June 7, 2015, White had to drive to Fitzpatrick's home to pick up G.F., who had been visiting his father that weekend. Originally, because they lived some distance from each other, Fitzpatrick and White agreed that he would meet her at a gas station about 30 minutes from his home in Breese, Illinois. Fitzpatrick, however, lied to White stating he could not meet White because he did not have a car seat for their son because Amber was not home. White was mad that she had to drive over an hour to Fitzpatrick's home.

What happened after White arrived at Fitzpatrick's home is in dispute. According to White, shortly after she entered the home, Fitzpatrick said, "Are you ready for this?" and struck her in the side of the head, knocking her to the foyer floor. Fitzpatrick then pinned her to the floor and began screaming that White had cut him with a razor. White contends that she did not cut Fitzpatrick and that his wounds were self-inflicted. While she did not see him cut himself, she saw blood dripping around her while Fitzpatrick held her face-down on the floor. At some point she saw Amber, G.F., and a little girl run through the house.

According to Fitzpatrick, when White came into his home, he yelled for G.F., who was in his bedroom, saying that his mom was there. White then "started running her mouth" about the pick-up schedule change and the court custody dispute. Next, she started hitting Fitzpatrick, and Fitzpatrick then noticed that he was bleeding. Once he realized that he had been cut, Fitzpatrick called to Amber, who was in the other room, and told her to get the kids out of the house and call 911. (In addition to G.F., there were two other children in the house: Amber's daughter and Amber and Fitzpatrick's daughter.) Fitzpatrick asserts that he struck White in the jaw in self-defense, knocking her to the ground. When he jumped on top of her, he noticed a knife in her hand and pushed it out, though he was unsure if he touched it.

Amber ran next door to Jay and Jaime Staser's house to get help and made a frantic call to 911 reporting that White had cut Fitzpatrick and said that she was going to kill him. Amber also asked the 911 dispatcher to send an ambulance. Jay Staser, in turn, ran

to the Fitzpatricks' home, where he found that Fitzpatrick had been stabbed and White was on the floor screaming, "I will kill you!" Staser then helped Fitzpatrick restrain White until the police came.

Officer Thomas Wuest of the Breese Police Department was contacted by 911 dispatch that there was an active, physical domestic incident. Dispatch also advised that the "stepmother" had a knife inside the house. This was not the first time Wuest was at the Fitzpatricks' home; Wuest had responded to an earlier domestic disturbance call involving Fitzpatrick and Amber at their home.

When Wuest arrived, Staser poked his head out of the front door and told him to hurry up and get inside. Wuest entered the home to find the foyer and Fitzpatrick covered in blood, Fitzpatrick and Staser pinning White to the floor, and Fitzpatrick yelling that White had stabbed him. Fitzpatrick had blood gushing from a wound in his arm, and White had blood on her face and on her shirt. In an attempt to secure the scene, Wuest handcuffed White, who was screaming, and took her to the curb where he left her with a Clinton County deputy. While Wuest took White outside, Fitzpatrick and Staser stayed in the house by themselves for thirty seconds to two minutes while Fitzpatrick tended to his wounds. Wuest also called for backup and asked dispatch to call his supervisor, Sergeant Mark Berndsen, to come to the scene because of the seriousness of the situation.

Shortly thereafter, Berndsen, who was off-duty at the time, arrived. He saw White sitting on the curb and noticed that while she had blood on her face and shirt, she was not bleeding. Berndsen then went into the house where he listened as Fitzpatrick talked with Wuest and a deputy about what happened. Emergency medical personnel responded as well and treated Fitzpatrick at the scene for the multiple wounds to his face, neck, chest, and arm. Fitzpatrick was later treated at a nearby emergency room where he received five stitches in a wound near his collarbone and five staples in a wound in his arm.

Wuest briefed Berndsen on the situation and then returned to the house where he took photographs of the scene and Fitzpatrick and collected a small wooden-handled pocket knife into evidence. (The knife had no visible blood on it.[1]) He also photographed White as she sat outside on the curb. There is conflicting deposition testimony in the record

---

[1] On June 8, 2015, the day after the confrontation, G.F. told Berndsen that the knife was his and that his father had given it to him. G.F. stated that he did not have the knife at his father's house that weekend and that he normally kept it in a "junk drawer" at his mother's house. It is unclear from the record whether Berndsen spoke to G.F. about the knife before or after issuing his statement of probable cause. In July 2015, the knife was sent to the Illinois State Police forensic lab for testing which showed no blood or fingerprints.

about when the knife was discovered. Wuest testified at his deposition in this case that he saw the knife against the foyer wall while he was handcuffing White before removing her from the house, whereas Staser testified that he first saw the knife when one of the officers pointed it out after White had been taken out of the house.

While Wuest gathered evidence, Berndsen called the State's Attorney from the scene to ask whether they should take Fitzpatrick's shirt into evidence. According to Berndsen, the State's Attorney asked him what the shirt "was gonna prove," to which he responded that it had Fitzpatrick's blood on it. The State's Attorney then told Berndsen that "he didn't need it." (The Fitzpatricks later discarded the shirt.)

White was taken to the Clinton County jail for questioning where, after receiving *Miranda* warnings, she was interviewed by Berndsen. During the interview, she relayed her account of the evening's events and offered to take a lie detector test. At the end of the interview, Berndsen advised White that she was going to be charged with aggravated domestic battery, and he left her with jail personnel to be photographed and fingerprinted before returning to the Breese Police Station. Fitzpatrick and Amber were also interviewed later at the station after visiting the emergency room. Toward the end of his interview of Fitzpatrick, after Fitzpatrick inquired about next steps, Berndsen gave Fitzpatrick information about how to obtain a protective order and also confirmed counseling options were available for his son. After conducting the interviews, Berndsen completed a "statement of probable cause" for aggravated domestic battery, which was forwarded to the State's Attorney. The State's Attorney charged White in an information with two counts of aggravated battery and one count of aggravated domestic battery. The case proceeded to trial where a jury found White not guilty on all charges.

Before the resolution of White's criminal case, Fitzpatrick sought a protective order against White, which was granted, and custody of their child. Part of the evidence in the custody proceeding was White's then-pending criminal charges. Primary custody was granted to Fitzpatrick. White regained primary custody after her acquittal.

In federal court, White sued Fitzpatrick, Amber, Wuest, Berndsen, and Staser alleging that they conspired to deprive her of her rights under the Fourth and Fourteenth Amendments. White also asserted various state law claims, including conspiracy and false arrest. She also sued the City of Breese, asserting a *Monell* claim based on the officers' conduct, specifically, leaving Fitzpatrick and Staser unattended in the house and not taking Fitzpatrick's shirt into evidence, and their superior's tacit approval of that conduct. White dismissed Staser from the suit. The district court granted summary judgment to the remaining defendants on the federal claims concluding that there was no conspiracy, the officers had probable cause to arrest White, the officers were entitled

to qualified immunity, and the defendants did not violate White's right to due process. The district court also granted summary judgment on the state false arrest claim because it held that it was tied to the probable cause determination, but declined to exercise supplemental jurisdiction over the remaining state law claims. White now appeals.

## II.

We review the district court's grant of summary judgment *de novo* taking all reasonable inferences in favor of White as the non-moving party. *Burritt v. Ditlefsen*, 807 F.3d 239, 248 (7th Cir. 2015). "Summary judgment is proper when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

### A. Probable Cause

On appeal, White argues that the district court erred in concluding the officers had probable cause to arrest her. "Probable cause is an absolute defense" to a false arrest claim in violation of the Fourth Amendment. *Hurt v. Wise*, 880 F.3d 831, 841 (7th Cir. 2018). If the police officers had probable cause to arrest White, our inquiry on the Fourth Amendment claim for false arrest "is foreclosed." *Fleming v. Livingston Cty.*, 674 F.3d 874, 878 (7th Cir. 2012). "A police officer has probable cause to arrest when, at the moment the decision is made, the facts and circumstances within her knowledge, and of which she has reasonably trustworthy information would warrant a prudent person in believing that suspect has committed or was committing an offense." *Id.* at 878–79 (quoting *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999)). To make a determination regarding probable cause, "we must step into the shoes of a reasonable person in the position of the officer, considering the facts known to the officer at the time." *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013) (internal quotation omitted). An officer's belief need not "be correct or even more likely true than false, so long as it is reasonable." *Fleming*, 674 F.3d at 879 (quoting *Qian*, 168 F.3d at 953). Eyewitness statements may supply probable cause, regardless of "whether the accused person denies the allegations." *Askew v. City of Chicago*, 440 F.3d 894, 895 (7th Cir. 2006). "Police need not conduct an investigation but may arrest and let prosecutors and courts determine who is telling the truth." *Id.* Finally, "[w]hether an officer had probable cause to make an arrest generally will present a question for the jury, although the court can decide it when the material facts are not disputed." *Jones ex rel. Jones v. Webb*, 45 F.3d 178, 182 (7th Cir. 1995).

In her opening brief, White essentially reargues what appears to be the evidence of her criminal case. Neither the district court nor this court, however, have been tasked with determining White's criminal liability or even deciding exactly what happened the evening of June 7, 2015. Rather, our charge is to look at the totality of the circumstances

and determine whether it was reasonable for Wuest and Berndsen to conclude at the time of her arrest that there was probable cause. We hold that such a conclusion was reasonable.

The salient facts that were known to Wuest and Berndsen at the time of White's arrest are as follows: There was a frantic 911 call that White had a knife and was threatening to kill Fitzpatrick at the residence where police had previously been called for a domestic dispute. When the officers arrived on the scene, Fitzpatrick was bloody with open wounds on his outer forearm and near his collarbone, and White was covered in blood, though not bleeding, and was pinned down by Fitzpatrick and Staser. A knife was recovered from the scene, but without any blood on it. Staser and Fitzpatrick both told the officers that White threatened to kill Fitzpatrick. The officers knew the following: White and Fitzpatrick were in the midst of a custody dispute, Fitzpatrick lied to White about being unable to meet her for their son's pick-up, Fitzpatrick claimed that White cut him, and White denied stabbing Fitzpatrick and asserted his wounds were self-inflicted.

In light of the severity and location of Fitzpatrick's wounds as well as what Fitzpatrick and Staser told police about White threatening to kill Fizpatrick and Amber's frantic 911 call, it was reasonable for an officer to believe that White had stabbed Fitzpatrick. The officers knew that White denied stabbing Fitzpatrick, but such inconsistencies are not fatal to a finding of probable cause. *See Askew*, 440 F.3d at 896 ("[P]olice often encounter competing and inconsistent stories.").

In support of her argument about whether there was probable cause to arrest her, White points to several issues of fact (the lack of blood and fingerprints on the knife, the timing of the knife's discovery at the scene, Fitzpatrick lying to her about his availability to drive G.F. to the agreed pick-up location, her statement and Berndsen's rejection of her offer to take a lie detector test, Berndsen advising Fitzpatrick about the protective order, Fitzpatrick and Staser not being searched for a knife or razor, and the alleged conspiracy among the defendants). These issues are not material to the determination of whether there was probable cause for her arrest. *See United States v. Sawyer*, 224 F.3d 675, 679 (7th Cir. 2000) ("Probable cause…does not require evidence sufficient to support a conviction or even evidence demonstrating that it is more likely than not that the suspect committed the crime."). As we noted in *Askew v. City of Chicago*, when police are "on the scene [they] must act yet lack the tools to determine immediately where the truth lies," and it is normal for conflicting stories, denials, and inconsistences to be present, including "[p]olice [not] always follow[ing] correct procedure[s]." 440 F.3d at 896. Whether to proceed with the case is a prosecutor's decision, and whether a jury convicts or acquits does not impact the existence of probable cause at the time of the arrest. *See id.* ("The Constitution permits

[police officers] to initiate the criminal process and leave the sifting of competing claims and inferences to detectives, prosecutors, judges, and juries in the criminal prosecution."). In light of the totality of the circumstances, we conclude that it was reasonable for the officers to arrest White and charge her with aggravated domestic battery.[2] Therefore, summary judgment on White's Fourth Amendment claim was proper. [3]

## B. Conspiracy

White argues that the district court erred by granting summary judgment on her claim that Fitzpatrick and Amber conspired with Wuest and Berndsen to deprive her constitutional rights. A private party can be liable under Section 1983 if he "conspired . . . with state officials to deprive [the plaintiff] of his civil rights." *Case v. Milewski*, 327 F.3d 564, 567 (7th Cir. 2003) (citing *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 152 (1970)). To establish conspiracy, White must "show an underlying constitutional violation" and that "the defendants agreed to inflict the constitutional harm." *Hurt*, 880 F.3d at 842. "Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative." *Daugherty v. Harrington*, 906 F.3d 606, 612 (7th Cir. 2018) (quoting *Beaman v. Freesmeyer*, 776 F.3d 500, 511 (7th Cir. 2015)).

White asserts various allegations to support her conspiracy claim: the Fitzpatricks' employment at a nearby federal prison, Fitzpatrick's and Staser's friendship with police officers, Staser is "best friends" with Wuest (a fact both men rebutted in their deposition testimony), Amber's prior employment at the Clinton County Sheriff's Office (where she knew Berndsen), Staser's and Wuest's membership on the volunteer fire department, Wuest's acquaintance with Fitzpatrick from previous domestic incidents (for which Fitzpatrick was arrested), and Wuest's and Fitzpatrick's children attend the same school. Even taking these assertions as true, the connection between these alleged facts and a conspiracy is speculative, and they do not establish conspiracy among the Fitzpatricks and the officers. The district court properly concluded that "the record is devoid of

---

[2] White also cites the opinion of her expert witness, Michael Lyman, a former police officer and criminology professor, that there was no probable cause for White's arrest. The facts are undisputed and the determination of probable cause is a question of law, so Lyman's opinion is unpersuasive. *See Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) ("As a general rule, [ ] an expert may not offer a legal opinion.").

[3] In her reply brief, White challenges the district court's grant of summary judgment to defendants on her common law false arrest claim against Fitzpatrick and Amber. She did not raise that issue in her opening brief and, therefore, has waived it. *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 843 (7th Cir. 2018).

evidence that Joseph and Amber Fitzpatrick acted in concert with the police to frame White and violate her rights." Therefore, summary judgment in favor of defendants on White's claim that the Fitzpatricks conspired with the officers to deprive her of her constitutional rights was appropriate.

## C. Due Process

White asserts that her due process right, namely her right to custody of her son, was deprived when Fitzpatrick and Staser planted the knife at the scene and when the officers failed to take Fitzpatrick's shirt into evidence.

Concerning the knife, "allegations of evidence fabrication can support a due process claim under § 1983." *Saunders-El v. Rohde*, 778 F.3d 556, 559 (7th Cir. 2015). If the fabricated evidence is later used to deprive an individual of his liberty in some way, the police officer has violated the individual's due process rights. *Id.* at 560 (citing *Whitlock v. Bruegemann*, 682 F.3d 567, 580 (7th Cir. 2012)).

White argues that Wuest gave Fitzpatrick and Staser the opportunity to plant the knife when he left them alone in the house while he took her outside. As we discussed above, there is no evidence that either of the officers acted in concert with Fitzpatrick and Staser, even if Fizpatrick and Staser planted the knife. Moreover, there is no evidence that Wuest was doing anything other than attempting to secure the scene, albeit not in the most thorough manner, by leaving a bleeding Fitzpatrick tending to his wounds alone with Staser in the house while taking White outside. Her due process claim based on her contention the police fabricated evidence by planting the knife fails.

Next, White argues that the officers' failure to take Fitzpatrick's t-shirt into evidence violated her due process rights. "[T]he destruction of potentially exculpatory evidence violates the defendant's right to due process if (1) the State acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such a nature that the petitioner was unable to obtain comparable evidence by other reasonably available means." *McCarthy v. Pollard*, 656 F.3d 478, 485 (7th Cir. 2011).

White has presented no evidence that the officers acted in bad faith when they did not take the shirt into evidence. Here Berndsen did not know if the evidence was exculpatory and sought the guidance of the State's Attorney about whether to take the shirt into evidence.[4] "[C]riticism of police methods does not by itself establish a

---

[4] White argues that Berndsen first mentioned his call to the State's Attorney about the shirt in this case and never mentioned the call in any of the child custody, protective order, or criminal proceedings that occurred before this case. Based on the record from those prior proceedings filed with the district court,

constitutional violation." *Hart v. Mannina*, 798 F.3d 578, 588 (7th Cir. 2015). "A police officer's duty to preserve evidence applies when the officer either knows the evidence is exculpatory or destroys the evidence in bad faith." *Id.* at 589. Mere negligence by police absent a showing of bad faith does not constitute a constitutional violation. *See Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988) (holding there was no denial of due process when police, while investigating a sexual assault, failed to refrigerate the victim's clothing and perform tests on semen samples where there was no suggestion of bad faith by the police and that such conduct was "at worst" negligence).

White has also presented no evidence that the shirt had any exculpatory value. White argues that "[a]ny cutting instrument necessarily would have gone through [Fitzpatrick's] shirt to inflict the wound on his left shoulder, near the neck, but beneath the collar line. On the other hand, a wound could have been self-inflicted by a razor without cutting the shirt." At best, this argument is speculative and establishes that the shirt had a very low exculpatory value to the fundamental issue in the criminal case, which was whether it was White or Fitzpatrick who cut Fitzpatrick. Moreover, because of the location of the wound near the collarbone, either Fitzpatrick or White could have easily cut or not cut through the shirt when inflicting the wound; thus, had the shirt been preserved its exculpatory value would have been minimal. *See generally California v. Trombetta*, 467 U.S. 479, 489 (1984) (noting that the exculpatory value of evidence must be apparent and holding that the preservation of breath samples from breathalyzers had extremely low chance of having any exculpatory value to defendants' defenses because it would only confirm the breath test machine's determination). Accordingly, White has failed to establish that her due process right to custody of her child was violated by fabrication of evidence or the destruction of exculpatory evidence.

## D. *Monell* **Claim**

White argues that the City of Breese violated her constitutional rights under the Fourth and Fourteenth Amendments pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). White forfeited her right to raise this issue on appeal by failing to present any arguments on this issue before the district court. There she merely stated that "[i]ssues of fact exist precluding Summary Judgment in favor of the City of Breese," without citing what those facts were or why they precluded summary judgment on this issue. *Jarrard v. CDI Telecomms., Inc.*, 408 F.3d 905, 916 (7th Cir. 2005) (holding that an appellant who "failed to develop [an argument] in the district court (or here for that

---

Berndsen was never questioned in those prior proceedings about what he did with the shirt or why he did not take it into evidence.

matter) with citation to relevant authority or meaningful argument" forfeited the argument on appeal). Therefore, we affirm the district court's grant of summary judgment on White's *Monell* claim.

### III.

Based on the totality of the circumstances, the officers had probable cause to arrest White. There is no evidence to support White's claims that the Fitzpatricks conspired with the officers or that her due process rights were violated. Finally, White forfeited her right to challenge the district court's grant of summary judgment in favor of the City of Breese on her *Monell* claim. For these reasons, we AFFIRM the grant of summary judgment.