In the

# United States Court of Appeals
## For the Seventh Circuit

No. 22-2467

TABATHA WASHINGTON and DONTE HOWARD,

*Plaintiffs-Appellants,*

*v.*

CITY OF CHICAGO, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cv-00442 — **Manish S. Shah**, *Judge.*

ARGUED OCTOBER 24, 2023 — DECIDED APRIL 15, 2024

Before ROVNER, WOOD, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* This case presents claims for
unlawful pretrial detention under the Fourth Amendment
and 42 U.S.C. § 1983, along with state-law claims for
malicious prosecution. Plaintiffs Tabatha Washington and
Donte Howard claim that defendants, Chicago Police
Department detectives Vincent Alonzo, Adrian Garcia, and
Demosthenes Balodimas, deliberately misled judges and a
grand jury to secure judicial determinations of probable cause

to detain plaintiffs on charges of first-degree murder. After over a year in custody, Washington and Howard were tried and acquitted on all charges. They then filed this suit. The district court granted summary judgment to the defendants, and plaintiffs have appealed.

Fourth Amendment claims for unlawful pretrial detention can survive a judicial determination of probable cause. See generally *Manuel v. City of Joliet*, 580 U.S. 357 (2017) (*Manuel I*). "[P]retrial detention is a 'seizure'—both *before* formal legal process and *after*—and is justified only on probable cause." *Lewis v. City of Chicago*, 914 F.3d 472, 477 (7th Cir. 2019), citing *Manuel I*, 580 U.S. at 366–67. "[I]f the proceeding is tainted—[such as] by fabricated evidence—and the result is that probable cause is lacking, then the ensuing pretrial detention violates the confined person's Fourth Amendment rights…." *Manuel I*, 580 U.S. at 369 n.8.

The existence of probable cause is a defense to both Fourth Amendment and malicious prosecution claims. *Young v. City of Chicago*, 987 F.3d 641, 646 (7th Cir. 2021). Consequently, this case turns on whether probable cause existed to detain Washington and Howard in advance of their trials. In civil litigation like this case, a rebuttable presumption of probable cause arises after a judicial determination of probable cause. See *Lewis*, 914 F.3d at 477. To overcome this presumption, plaintiffs must show "that the officer who sought the warrant [1] 'knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and [2] that the false statements were necessary to the judicial officer's determination that probable cause existed for the arrest.'" *Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir. 2010) (alterations omitted), quoting *Beauchamp v. City of Noblesville*,

320 F.3d 733, 742–43 (7th Cir. 2003), citing in turn *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978).[1]

Here, undisputed facts show that plaintiffs cannot rebut this presumption. Even if we assume plaintiffs' list of the detectives' alleged misrepresentations and omissions is correct, plaintiffs cannot meet the second prong of the test in *Beauchamp*: establishing that those false statements or deliberately misleading omissions were "necessary" to the judicial officers' determinations of probable cause. This is so for two independent reasons. First, the State's Attorney's Office conducted its own independent fact-gathering before deciding to file charges. Second, and again, assuming that plaintiffs' list of misrepresentations and misleading omissions is correct, the remaining undisputed facts would still show probable cause to detain plaintiffs for first-degree murder. Because plaintiffs cannot overcome the presumption of probable cause that arises after a judicial determination, we affirm summary judgment for the defendants.

I. *Factual and Procedural Background*

A. *Factual History*

In the evening of May 30, 2018, plaintiffs Tabatha Washington and Donte Howard, along with Washington's cousin Carlton White, all engaged in physical altercations with Kim Edmondson outside Washington's apartment in Chicago. When the conflict ended, Edmondson left the area and walked about half a mile north. There he encountered three of his friends, Anthony Beard, Khadijah Hill, and Larry

---

[1] Because *Beauchamp* was the first case in which we set out this two-prong test, we refer to it as the *Beauchamp* test in this opinion. See 320 F.3d at 742–43.

Nelson, in a parking lot. Edmondson was shirtless and bleeding from his lip and chest. He told his friends that he had been jumped by two men and one or two women with a pole. He then walked behind a nearby dumpster to urinate. Soon after that, someone else told Beard, Hill, and Nelson that Edmondson had collapsed. They walked over and saw him behind the dumpster lying on his back, not breathing, with blood pooling around his head. They called 911 and flagged down nearby police officers, but first responders were unable to revive Edmondson. He was pronounced dead at the scene. The medical examiner later concluded that Edmondson died from blunt-force trauma to the back of the head.

Chicago Police Department detectives Vincent Alonzo, Adrian Garcia, and Demosthenes Balodimas arrived to investigate. The three parking-lot witnesses each told them of Edmondson's wounds to the chest and lip, and they told the detectives Edmondson's story about being beaten up by several of his neighbors. One of the parking-lot witnesses knew where Edmondson had lived and led detectives to the apartment building, about a half-mile away—the same building where Washington lived.

The detectives canvassed the building to see if anyone knew about an altercation with Edmondson. Detective Balodimas later said that, when he was standing outside Washington's apartment, he heard her say, "F*** that b**** he got what he deserved," and "he ain't gonna get my gun." Balodimas also said he heard White say, "You gotta protect, you gotta fight." Plaintiffs dispute all of these assertions. A detective knocked on the door of Washington's apartment and Washington, White, and Howard opened the door. Howard at first told the detectives they could not enter without a

warrant. The detectives asked if everything was alright, and Washington told them "there was an altercation earlier, with some guy that had been evicted from this building." She also said, "He was trying to fight me."

Washington then allowed the detectives to enter her apartment. She and White spoke to detectives in one room while Howard and another friend, Cynthia Cage, sat on a couch nearby. White explained that there was an altercation with a man who had been evicted from the building who "kept coming around trying to fight," and White was defending himself. Washington added "he tried to hit me," saying she hit him to defend herself. Detective Garcia told the group that they needed to come to the police station to straighten everything out. Washington said that Cage had not been involved in the altercation and that Howard had just gotten there. Howard told detectives falsely that his name was Jeremiah Johnson and claimed that he had just arrived at the apartment.

The detectives handcuffed Washington and White, placed them in separate squad cars, and took them to the police station for further investigation. Once at the station and just after midnight on May 31, Detectives Garcia and Alonzo began separately interrogating Washington and White. During the various overnight interrogations, White and Washington recounted a variety of sometimes contradictory details about their encounter with Edmondson. The district court's order granting summary judgment provides a thorough account of their various explanations during these interrogations. *Washington v. City of Chicago*, No. 20-cv-442, 2022 WL 2905669 (N.D. Ill. July 22, 2022).

White told detectives that Edmondson had attacked him a week earlier and had left a cut on his face. White said the

altercation earlier that evening started when Edmondson—clearly high on cocaine or other drugs—approached him and Cage and repeatedly called Cage a b****. When White tried to calm him down, Edmondson swung at him. White ducked the punch and hit Edmondson once. White eventually indicated that Washington came out from her apartment with a gray, non-wooden stick and hit Edmondson "probably three" times—in the chest, arm, and lip—telling him, "stop playing with my cousin."

After being told that Washington had identified a third man involved in the fight, White ultimately confirmed that the other man in the fight had been Howard, whom the detectives had spoken to in Washington's apartment but who had given the detectives a false name and falsely said he had just arrived there. White said that Howard was tussling in the street with Edmondson but that they were not really fighting. White repeatedly told detectives that neither Howard nor Edmondson landed a punch on the other and that Edmondson left after the fight with Howard. It was then, according to White, that Washington ran up and hit Edmondson with the little stick. According to White, Edmondson then said, "I'll be back," and walked away, and White thought it was over. White was adamant that no one ever hit Edmondson on the top of the head and that Edmondson had no head injury when he left the scene of the altercation.

In separate interrogations the same night, Washington at first denied having any negative history with Edmondson. She admitted to hitting Edmondson in the chest with a stick or a pole after he tried to hit her, and she said White had stepped in and begun to fight Edmondson. She also admitted

that after she had tried to break up the fight between White and Edmondson, a third man had gotten involved, at first saying that she did not know his identity but ultimately identifying him as plaintiff Howard, the second man in her apartment earlier that evening. The detectives told her they did not believe she was physically capable of causing the fatal damage to Edmondson's head. Washington eventually told the detectives three times that Howard had struck Edmondson twice in the head with a pole. She apologized to the detectives for lying and insisted that she did not know how hard Howard had hit Edmondson.

Later that morning, May 31, detectives went back to Washington's apartment to speak to her friend Cage. Cage told the detectives that White and Edmondson started arguing in front of the building and that White punched Edmondson while the two were arguing. Cage said that during the altercation between White and Edmondson, Washington had approached with a pole in her hand and had hit Edmondson with it several times. Then, Cage continued, Howard began to fight with Edmondson in the middle of the street, landing some punches before Edmondson walked away toward the parking lot where he encountered his friends Beard, Hill, and Nelson. She said Edmondson was bleeding from the mouth but otherwise appeared fine when he left.

Later that same day, a prosecutor from the Cook County State's Attorney's Office, Assistant State's Attorney Patrick Waller, began re-interviewing witnesses. ASA Waller interviewed the parking-lot witnesses (Beard, Hill, and Nelson) at the police station. The witnesses repeated that Edmondson had walked up to them with cuts on his chest and

lip and said that a couple of guys and a woman jumped him with a pole or a pipe. Edmondson had then walked off and collapsed behind a dumpster. Hill also said that she had observed Edmondson only from the front and did not see any leaking or dripping blood down his back. None of the three witnesses told detectives or the state's attorneys that they saw Edmondson bleeding from the top or back of his head.

Later that night, ASA Waller then re-interviewed White and Washington separately. White told ASA Waller that he had been with Cage, Washington, and Howard, and that Edmondson had tried to force his way into Washington's apartment. That was when Washington had threatened Edmondson with a pole. Edmondson had backed away but started to yell and got "into White's face" before White struck him. Howard had then approached and started fighting with Edmondson in the street. Washington had gone into the house, come out with a little gray aluminum stick, and hit Edmondson multiple times in the chest, arm, and lip.

Shortly after, ASA Waller reinterviewed Washington. She told Waller that she had been outside with Cage, White, and Howard when Edmondson approached and got in her face. At that point, she said, she found a light metal pole on the ground and swung it at him three times. She said she struck Edmondson on the left side of his lip first and then on his chest after he jumped at her again, but that the third swing missed because Edmondson had jumped back.

ASA Waller asked Washington about Howard's involvement. Washington said he and Edmondson had thrown only a few punches and then Edmondson had left. When Waller asked whether she, Cage, Howard, and White were discussing the altercation in the apartment later that night,

Washington told Waller that she could not remember specifics but said everybody had been talking loudly about what had happened. ASA Waller confronted Washington about her previous statements about Howard striking Edmondson in the head with the pole. Washington responded that she had been talking fast and was scared and nervous. Washington said that she had not meant to say Howard had hit Edmondson with the pole. Howard "was hitting him with his fists," Washington said, and "that's why I said I don't see how his head got bust[ed]." Washington repeatedly insisted that she had never hit Edmondson in the head.

Edmondson's autopsy was performed the morning of May 31. The medical examiner concluded that the cause of death was blunt-force trauma to the head. The autopsy revealed a 1.25-inch by .75-inch laceration on the top, back, right side of Edmondson's head; a hole in his skull that was about one inch by one inch, and fragments of bone within the brain. Other injuries included lacerations and contusions to Edmondson's left lip, an abrasion to his left ear, a laceration to the center of his chest, and multiple contusions on both arms. The examiner concluded that Edmondson's death was a homicide based on the investigator's report of assault and her own examination of Edmondson's injuries, which were consistent with an assault. The examiner spoke with defendant Alonzo about the results of her autopsy.

Washington gave consent to search her apartment to locate the pole she had used on Edmondson. At her apartment, Detectives Alonzo and Balodimas recovered four silver metal poles that appeared to be one inch in diameter, which they submitted to the Illinois State Police crime lab for processing. At that point, ASA Waller designated the investigation as

continuing and advised another ASA, Laura Ayala-Gonzalez, of all the information he had learned during his investigation.

B. *Procedural History in State Court*

The next day, on June 1, ASA Ayala-Gonzalez approved a first-degree murder charge against Washington. This charge was the subject of Washington's pretrial detention hearing. At the time, Howard had not yet been arrested. The Felony Minutes form—created and signed by Detective Alonzo for use in a probable-cause detention hearing and approved by ASA Ayala-Gonzalez—stated: "The facts briefly stated are as follows: The defendant, Washington, was arrested after investigation determined that the victim Kim Edmondson was struck on and about the head with a metal object several times by Washington. The victim Edmondson subsequently expired due to the injuries received." Detective Alonzo spoke with ASA Ayala-Gonzalez when she approved the charges for Washington and rejected charges for White.

At Washington's hearing on June 2, the Circuit Court of Cook County denied bail, finding "that the proof is evident and presumption great that [Washington], along with some other uncharged co-defendants as of yet, committed the offense." Immediately after this determination of probable cause, the prosecutor informed the court that he had amended the charge to "felony murder based upon [mob] action," which is a first-degree murder charge in Illinois. Defense counsel waived any objection to this change.[2]

---

[2] The hearing transcript reads "felony murder based upon action" and the insertion of "mob" is suggested by the defendants here. We believe this is the most likely reading of the transcript.

Howard was taken into custody on June 4. On June 6, ASA Ayala-Gonzalez approved the first-degree murder charge against him. At the start of Howard's pretrial detention hearing before a Cook County judge on June 7, the complaint against him was amended to add a violation of probation. In the remainder of his hearing, the court found probable cause to detain Howard without bail on both the murder and probation violation charges until the "murder case" with Washington was to be heard three weeks later.

On June 28, 2018, Washington and Howard were indicted by a grand jury for the offenses of felony mob action and first-degree murder. The grand jury heard testimony from defendant Detective Alonzo, as well as Washington's friend Cage, and the parking-lot witnesses, Nelson, Beard, and Hill. Washington and Howard were indicted under all three prongs of Illinois's first-degree murder statute, including on a felony murder theory premised on the underlying felony of mob violence. Over a year later, after a one-day bench trial, a Cook County judge found Washington and Howard not guilty on all counts.

C. *Federal Proceedings*

Washington and Howard then filed this suit against Detectives Alonzo, Garcia, and Balodimas, and the City of Chicago for unlawful pretrial detention under the Fourth Amendment and 42 U.S.C. § 1983 and for malicious prosecution under Illinois law. The defendants moved for summary judgment.

The district court began its analysis "with the offenses of mob action and first-degree murder—the charges brought by prosecutors and on which the grand jury indicted plaintiffs."

2022 WL 2905669, at *10. The district court considered the existence of probable cause for pretrial detention premised on a felony-murder theory with mob violence as the underlying felony, though plaintiffs had also been indicted on other theories of first-degree murder. After identifying the elements of the felony-murder and mob violence offenses, the district court held that "at the time of plaintiffs' … detention, defendants possessed probable cause to believe that plaintiffs had acted as part of a group that engaged in violence against Edmondson." *Id.* Per the district court, "undisputed facts demonstrate that, at the time of plaintiffs' … detention … [i]t was reasonable, given these facts, for defendants to believe that plaintiffs had engaged in criminal conduct." *Id.* "The facts known to defendants reasonably suggested that plaintiffs … were part of a group engaged in physical violence against Edmondson." *Id.* The district court said that this "was enough to support the … detention of plaintiffs while prosecutors weighed specific charges." *Id.* The court granted summary judgment to the defendant detectives and the City of Chicago on all claims and terminated the case. Washington and Howard filed this appeal.

## II. *Standard of Review*

We review de novo the district court's grant of summary judgment. *Young v. City of Chicago*, 987 F.3d 641, 643 (7th Cir. 2021). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We draw 'all justifiable inferences' in the favor of the non-moving party." *Flexible Steel Lacing Co. v. Conveyor Accessories, Inc.*, 955 F.3d 632, 643 (7th Cir. 2020), quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). We have applied this standard in our account of the facts.

III. *Analysis*

   A. *Fourth Amendment: Pretrial Detention Without Probable Cause*

Section 1983 authorizes suits against police officers and others who violate federal constitutional or statutory rights while acting under the color of state law. See 42 U.S.C. § 1983. Plaintiffs' suit under section 1983 alleges that the City of Chicago and three of its police detectives violated their Fourth Amendment rights. To prove a Fourth Amendment violation, a plaintiff must show first that a seizure occurred, and then, if so, that the seizure was unreasonable. *Carlson v. Bukovic*, 621 F.3d 610, 618 (7th Cir. 2010).

"[P]retrial detention is a 'seizure'—both *before* formal legal process and *after*…." *Lewis v. City of Chicago*, 914 F.3d 472, 477 (7th Cir. 2019), citing *Manuel v. City of Joliet*, 580 U.S. 357, 366–67 (2017) (*Manuel I*). The Fourth Amendment "establishes 'the standards and procedures' governing pretrial detention" in criminal cases. *Manuel I*, 580 U.S. at 360, quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975). The standard of reasonableness required to justify "pretrial detention is probable cause, that is, official knowledge of 'facts and circumstances sufficient to warrant a prudent [person] in believing' the detainee has committed a criminal offense." *Williams v. Dart*, 967 F.3d 625, 632 (7th Cir. 2020) (alteration in original), quoting *Gerstein*, 420 U.S. at 111. Plaintiffs Washington and Howard argue that the defendant detectives violated their Fourth Amendment right against unreasonable seizures by causing them to be

detained before trial without probable cause. See *Manuel I*, 580 U.S. at 364–69.[3]

B. *The Presumption of Validity for Judicial Determinations of Probable Cause*

Judicial determinations of probable cause are ordinarily entitled to a presumption of validity, *Lewis*, 914 F.3d at 477, and "an indictment is prima facie evidence of probable cause," *Coleman v. City of Peoria*, 925 F.3d 336, 351 (7th Cir. 2019). But this presumption is rebuttable. In *Manuel I*, the Supreme Court taught that Fourth Amendment claims sometimes survive a judicial determination of probable cause. 580 U.S. at 368–69 (plaintiff may seek relief for violations of Fourth Amendment rights "not merely for his (pre-legal-process) arrest, but also for his (post-legal process) pretrial

---

[3] In the district court, the parties debated whether, to sustain pretrial detention, a finding of probable cause must relate to the charged offense, or whether a generic finding of probable cause to believe the detainee committed *any* criminal offense is sufficient. In its order granting summary judgment, the district court implied that Washington and Howard could have been lawfully detained in advance of their trial for first-degree murder and mob action because probable cause existed for other crimes under the Illinois code, such as battery, aggravated battery, disorderly conduct, and obstruction. Washington and Howard challenge this portion of the district court's ruling, arguing that, because plaintiffs' probable-cause hearings had been directed specifically to the charges of murdering Edmondson, probable cause for pretrial detention could not be premised on "other hypothetical charges." On appeal, the defendants seem to have conceded this point, admitting that pretrial detention required "probable cause to believe that Washington and Howard killed Edmondson," and waiving any argument that probable cause related to *any* criminal conduct would have been sufficient. Because we find the undisputed facts support probable cause for first-degree murder and mob action, we need not decide this issue here.

detention." (footnote omitted)). The Supreme Court explained:

> The Fourth Amendment prohibits government officials from detaining a person in the absence of probable cause. That can happen when the police hold someone without any reason before the formal onset of a criminal proceeding. But it also can occur when legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements. Then, too, a person is confined without constitutionally adequate justification. Legal process has gone forward, but it has done nothing to satisfy the Fourth Amendment's probable-cause requirement. And for that reason, it cannot extinguish the detainee's Fourth Amendment claim….

*Manuel I*, 580 U.S. at 367 (citations omitted).

*Manuel I* "clarified that the constitutional injury arising from a wrongful pretrial detention rests on the fundamental Fourth Amendment principle that a pretrial detention is a 'seizure'—both *before* formal legal process and *after*—and is justified only on probable cause." *Lewis*, 914 F.3d at 476–77, citing *Manuel I*, 580 U.S. at 366–67. In this sort of claim, "the constitutional right in question is the 'right not to be held in custody without probable cause,'" which gives rise to a Fourth Amendment claim under section 1983 since "the essential constitutional wrong is the 'absence of probable cause that would justify the detention.'" *Lewis*, 914 F.3d at 479, quoting *Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018) (*Manuel II*). "Put another way, the initiation of formal legal

process 'did not expunge [plaintiff's] Fourth Amendment claim because the process he received failed to establish what that Amendment makes essential for pretrial detention— probable cause to believe he committed a crime.'" *Lewis*, 914 F.3d at 477, citing *Manuel I*, 580 U.S. at 368–69.

C. *Overcoming the Presumption of Validity*

Plaintiffs argue they were detained before trial without probable cause in violation of their Fourth Amendment rights as set out in *Manuel I*. 580 U.S. at 366–67. Both plaintiffs received judicial determinations of probable cause pursuant to legal process: Washington and Howard were separately brought before the Circuit Court of Cook County for bail hearings. The court found probable cause to detain both without bail. A few weeks later, Washington and Howard were indicted by a grand jury on charges of first-degree murder, including a felony-murder theory premised on felony mob action. Under *Manuel I*, these judicial determinations of probable cause do not automatically bar plaintiffs' Fourth Amendment claims for wrongful pretrial detention, regardless of whether the judicial determinations of probable cause were made in a bail hearing or through an indictment. *Manuel I*, 580 U.S. at 369 n.8 ("Nothing in the nature of the legal proceeding establishing probable cause makes a difference for purposes of the Fourth Amendment….").

Thus, plaintiffs must overcome the presumption of validity created by the judicial determinations of probable cause at their bail hearings and in their indictment. "[T]his presumption is premised on an 'assumption … that there will be a *truthful* showing' of probable cause." *Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir. 2010) (alteration in original), quoting *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978). We have thus

held that "the presumption may give way on a showing [1] that the officer who sought the warrant 'knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and [2] that the false statements were necessary to the judicial officer's determination that probable cause existed for the arrest.'" *Whitlock*, 596 F.3d at 410 (alterations omitted), quoting *Beauchamp v. City of Noblesville*, 320 F.3d 733, 742–43 (7th Cir. 2003), citing in turn *Franks*, 438 U.S. at 155–56. The second half of the test in *Beauchamp* follows logically from the requirement that, "[t]o establish personal liability in a section 1983 action, the plaintiff must show that the officer 'caused the deprivation of a federal right.'" *Ortiz v. City of Chicago*, 656 F.3d 523, 539 (7th Cir. 2011), quoting *Luck v. Rovenstine*, 168 F.3d 323, 327 (7th Cir. 1999), quoting in turn *Hafer v. Melo*, 502 U.S. 21, 25 (1991). We discuss each prong in turn.

### 1.  *Prong One: False Statements Made to Judicial Officer*

To satisfy the first prong of *Beauchamp*, plaintiffs Washington and Howard argue that the police detectives deliberately misrepresented certain inculpatory evidence and omitted exculpatory evidence in their communications to the prosecutors, the bail hearing courts, and the grand jury. Plaintiffs identify the following conduct by defendant detectives as instances of false statements or omissions:

> *False Statements*
>
> (1) oral statements to prosecutors that Washington hit Edmondson on the "head" when referring to her blow to his lip;
>
> (2) written statements on the Felony Minutes form submitted in Washington's pretrial

detention hearing that she struck Edmondson "on and about the head with a metal object several times" and that Edmondson "subsequently expired due to the injuries received";

(3) oral statements to prosecutors that either plaintiff hit Edmondson in the *back* of the head with any weapon, causing Edmondson's fatal wound in the back of his skull;

(4) statements to judicial officers that Detective Balodimas overheard incriminating statements, which plaintiffs claim he unilaterally invented.

*Omissions*

(1) failure to share with prosecutors or judicial officers video evidence showing Edmondson walking half a mile after the altercation;

(2) failure to tell prosecutors that no witness saw a wound on the back of Edmondson's head prior to his fall near the dumpster;

(3) failure to tell prosecutors that White and Washington had reported that Edmondson was the aggressor in the altercation, not Washington or Howard.

We begin with the purported false statements. We are reviewing a grant of summary judgment to defendants, which requires us to give plaintiffs the benefit of any genuine disputes of material fact and any reasonable favorable inferences, but we do not draw inferences that are supported by only speculation or conjecture. *King v. Hendricks County Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). Items (1) and (2),

the defendants' statements to judicial officers and on the Felony Minutes form that Washington hit Edmondson on the head, referring to the wound she caused on his lip, might be true in a technical sense. As one of the defendants reminded plaintiffs' counsel in a deposition, "[t]he lip … is part of the head." A jury could reasonably deem such statements intentionally misleading, though, since defendants knew that Washington admitted to hitting him in the lip while Edmondson died from blunt-force trauma to the back of his head. This is especially true of the statements on the Felony Minutes form, which asserted that Washington's blows caused Edmondson's death.

As to statement (3), the detectives did have an admission from Washington herself that Howard had hit Edmondson on the head with a metal pipe, so we do not believe a reasonable jury could find any statement to that effect was knowingly or recklessly false. But (4), the incriminating statements purportedly overheard by defendant Balodimas, are also disputed material facts. Because we construe facts in favor of the non-moving parties on summary judgment, we must assume they were invented by Balodimas. Thus, for the purposes of summary judgment, we find that statements (1), (2), and (4) were false statements made intentionally, knowingly, or with at least reckless disregard for their truth, satisfying the first prong of *Beauchamp*.

We also consider the asserted misleading omissions. As to omission (1), it remains disputed whether prosecutors had access, before plaintiffs' initial bail hearings, to the security footage of Edmondson walking half a mile after his altercation with Washington and Howard. On May 31, before the first bail hearing, defendant Alonzo reviewed footage of

Edmondson entering the parking lot and showing no obvious signs of distress. On June 6, several days after Washington's bail hearing but the day before Howard's bail hearing, Alonzo also obtained video from Edmondson's half-mile walking route between the site of the altercation and the location of the dumpster. It remains in dispute whether defendants ever turned these videos over to the State's Attorney's Office for consideration in their charging decisions. We assume for purposes of summary judgment that defendants did not. The trial judge relied on these videos in her acquittal, and we agree that these videos are material and exculpatory. We find that a reasonable jury could infer that defendants exhibited at least reckless disregard for the truth in failing to turn over the parking-lot video. Its exculpatory value was self-evident, and defendants had access to it well in advance of both plaintiffs' bail hearings. This omission satisfies the first prong of *Beauchamp*.

For omissions (2) and (3), a reasonable jury could not infer that the omissions were made with intentional, knowing, or reckless disregard for the truth. The defendants knew that ASA Waller had independently re-interviewed Washington, White, and the parking-lot witnesses because a detective sat in on each of these interviews. In those interviews, Washington told ASA Waller that Edmondson was the one who started cursing at her and threatening a physical confrontation. White told ASA Waller that the confrontation started when Edmondson tried to force his way into Washington's apartment. And each of the parking-lot witnesses told ASA Waller the location of the wounds they saw on Edmondson's body prior to his death, with none mentioning the back of his head. Consequently, no reasonable jury could find that defendants' failure to inform prosecutors

that no parking-lot witness saw a wound on the back of Edmondson's head, and their failure to report Washington and White's statements that Edmondson had been the aggressor, were done with intentional, knowing, or reckless disregard for the truth. Omissions (2) and (3) do not satisfy the first prong of *Beauchamp*.

In sum, for purposes of summary judgment, we treat statements (1), (2), and (4), as well as omission (1), as false statements made to a judicial officer "knowingly or intentionally or with a reckless disregard for the truth," satisfying the first prong of *Beauchamp*'s test for overcoming the presumption of validity of judicial determinations of probable cause. 320 F.3d at 742. We next assess this bundle of arguable misstatements and omissions under *Beauchamp*'s second prong.

2. *Prong Two: Misrepresentations Necessary to Judicial Finding of Probable Cause?*

The second prong of *Beauchamp* requires "that the false statements were necessary to the judicial officer's determination that probable cause existed." 320 F.3d at 742. We begin with a threshold issue: what sort of causation is required between the false statements and the judicial determination of probable cause to overcome the presumption of validity? Defendants argue for but-for causation, grounded in *Beauchamp*'s use of "necessary" to describe the causal relationship. *Id.* Plaintiffs, meanwhile, rely on *Manuel*'s use of the word "tainted" to argue for a lesser standard, which they claim is akin to "proximate cause."[4]

---

[4] Plaintiffs do not explain why they think proximate causation, which is usually defined more narrowly than factual, but-for causation, would be an easier standard to meet. But we take it that plaintiffs are actually

The relevant line in *Manuel I* says that "if the proceeding is tainted—as here, by fabricated evidence—and the result is that probable cause is lacking, then the ensuing pretrial detention violates the confined person's Fourth Amendment rights." *Manuel I*, 580 U.S. at 369 n.8. When the Supreme Court's statement is read in context, it becomes clear that defendants' but-for standard is the correct one. Even the line referencing a "tainted" proceeding requires that, *as a result* of the taint, "probable cause is lacking." *Id.*; see also *Burrage v. United States*, 571 U.S. 204, 214 (2014) (calling it a "traditional background principle[]" of law that "a phrase such as 'results from' imposes a requirement of but-for causation"). This tracks with our use of "necessary" in *Beauchamp*. See 320 F.3d at 742; see also *United States v. Hatfield*, 591 F.3d 945, 948 (7th Cir. 2010) ("necessary condition" is another way of naming a "but-for" cause); *Ramos v. City of Chicago*, 716 F.3d 1013, 1019 (7th Cir. 2013) (civil plaintiff must show not only that detention was based on false evidence but also that his "seizure would lack probable cause without that false evidence"). Thus, the second prong of *Beauchamp* requires us to determine whether the evidence permits a reasonable inference that the arguably false statements and misleading omissions were collectively a but-for cause of the judicial determinations of probable cause to detain plaintiffs on first-degree murder charges.

In this case, two independent reasons bar a finding of but-for causation. First, the State's Attorney's Office conducted its

---

arguing for something akin to "substantial factor" causation, which applies in the "rare" situation where "multiple sufficient causes independently, but concurrently, produce a result," and under which strict but-for causation is not required. See *Burrage v. United States*, 571 U.S. 204, 214–15 (2014).

own independent fact-gathering before filing charges, rather than relying on the allegedly misleading statements of the defendant detectives. Second, "when the lies are taken out and the exculpatory evidence is added in," the remaining undisputed evidence still sufficed to support probable cause. *Rainsberger v. Benner*, 913 F.3d 640, 643 (7th Cir. 2019). Each reason alone would be sufficient to affirm summary judgment. We discuss each in turn.

a. *Independent Investigation by Prosecutors Eliminates But-For Causation*

First, plaintiffs fail to overcome the causation problem posed by prosecutors' own factual investigation in this case. Because the State's Attorney's Office did an independent investigation into the facts before approving charges and presenting the case to the bail courts and the grand jury, any misstatements and/or omissions by the defendant detectives regarding those same facts were not necessary to the judicial determinations of probable cause.

Plaintiffs admit that ASA Waller, the prosecutor originally assigned to determine whether charges should be filed, independently "spoke to Defendants and re-interviewed witnesses." Waller re-interviewed Washington and White, as well as the three parking-lot witnesses, Nelson, Beard, and Hill. From these interviews, as the district court noted,

> [T]he State's Attorney's Office knew … that no one claimed that Washington hit Edmondson on the top or back of his head or reported seeing Edmondson bleeding from the top or back of his head before his collapse. The prosecutor had access to the medical examiner and all the

> relevant witnesses and underlying source
> material. Waller also knew that Washington had
> gone back on her story about Howard hitting
> Edmondson in the head with a pole (because
> Washington told Waller this).

2022 WL 2905669, at *12. When a different prosecutor, ASA Ayala-Gonzalez, was assigned to the case, ASA Waller told her all he had learned from his independent fact-gathering. ASA Ayala-Gonzalez evaluated that evidence and then approved charges of first-degree murder against Washington and Howard. Plaintiffs are correct that there were different prosecutors at the two bail hearings, but this only makes clear that the State's Attorney's office collectively investigated the case. We agree with the district court that plaintiffs presented "no evidence that any defendant duped the State's Attorney into seeking pretrial detention or pursuing grand-jury indictments." 2022 WL 2905669, at *12. Like the district court, we find that "[t]he only reasonable conclusion to be drawn from the undisputed evidence is that the State's Attorney maintained control over plaintiffs' prosecution." *Id.*

The independent fact-gathering by the State's Attorney's Office, leading to an independent decision to prosecute plaintiffs, rendered superfluous any lies, misleading statements, or omissions by defendants relating to those independently gathered facts. See *Coleman*, 925 F.3d at 351 (overcoming presumption of probable cause requires "evidence that law enforcement obtained the indictment through improper or fraudulent means"). If plaintiffs believed the prosecutors had also knowingly or recklessly made false or misleading statements about material evidence, they might have tried to sue those prosecutors. See *Buckley v. Fitzsimmons*, 509 U.S. 259,

273–74 (1993) (absolute prosecutorial immunity does not extend to prosecutor acting in an investigatory capacity "before he has probable cause to have anyone arrested").

The prosecutor's independent investigation alone is sufficient reason to affirm summary judgment. It renders the purported misstatements and omissions by the detective defendants unnecessary to any judicial officer's determination of probable cause. *Beauchamp*, 320 F.3d at 742–43. We address next a second, independent reason that but-for causation is lacking between the misstatements and omissions and the judicial determinations of probable cause.

       b.  *Sufficient Evidence Remained to Support Probable Cause*

Even if the prosecutors had relied exclusively on the police detectives' descriptions of events, which we assume included the misrepresentations and omissions discussed above, there remained enough uncontested, reliable evidence to support probable cause as a matter of law. This is a second reason why, under *Beauchamp*, the misstatements and omissions raised by plaintiffs were not a necessary but-for cause of any judicial officer's determination of probable cause. This point supplies an independent ground for affirming summary judgment.

"Probable cause is a common-sense inquiry requiring only a probability of criminal activity; it exists whenever … a court has enough information to warrant a prudent person to believe," that, in this case, Washington and Howard killed Edmondson. *Young*, 987 F.3d at 644, quoting *Whitlock*, 596 F.3d at 411; see also *Doe v. Gray*, 75 F.4th 710, 719 (7th Cir. 2023) ("The existence of probable cause … depends, in the first

instance, on the elements of the predicate criminal offense(s) as defined by state law." (alterations in original; internal citation omitted)). Probable cause "deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity," so it "is not a high bar." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (internal quotations omitted).

Probable cause is "'assessed objectively' based on 'the conclusions that the … officer reasonably might have drawn from the information known to him.'" *Young*, 987 F.3d at 644, quoting *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). "In determining whether information submitted to a judicial officer in support of a warrant application was sufficient to establish probable cause, we look only at what the officer knew at the time he sought the warrant, not at how things turned out in hindsight." *Beauchamp*, 320 F.3d at 743. Probable cause existed if, at the time of plaintiffs' pretrial detention hearings, "the facts and circumstances within [the officer's] knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent person in believing that [plaintiffs] had committed the crimes." *Id*.

Here, the judicial officers were presented with sufficient undisputed facts to establish probable cause to believe that Washington and Howard killed Edmondson. Both plaintiffs were admittedly in a physical altercation with Edmondson a short time before he died. Washington admitted that she hit Edmondson with a metal pole on his chest and his lip. Detectives located a pole matching the description given by witnesses in Washington's apartment. A short time later,

Edmondson died from a serious wound to the head. Before he died, Edmondson told the parking-lot witnesses that he had been beaten by people who lived in his building, which is where Washington lived. The detectives had no evidence that Edmondson encountered any other person who might have caused his death, which the autopsy determined was due to blunt-force trauma to Edmondson's head. And Washington and Howard had been deceptive and evasive with defendant detectives upon arrest. Howard gave the detectives a false name, and Washington initially denied knowing the identity of the other person involved in the altercation with Edmondson, even though she knew and later admitted it was Howard.

Washington did not admit to dealing the fatal blow to the back of Edmondson's head, of course, but the detectives were not required to assume that no such blow took place. *Bridewell v. Eberle*, 730 F.3d 672, 676 (7th Cir. 2013) ("Police are entitled to draw on eyewitness descriptions without being required to assume that witnesses got every detail right, or that every omission from a description must establish that the omitted fact did not occur."). Far from it. Given Washington's admitted strike to Edmondson's face with a pipe, no reasonable jury could have found it unreasonable for the detectives to infer that Washington dealt an additional blow to the back of Edmondson's head with the same weapon. See *Williamson v. Curran*, 714 F.3d 432, 441 (7th Cir. 2013) ("When presented with a credible report of criminal behavior, an officer 'is under no constitutional obligation to exclude all suggestions that the witness or victim is not telling the truth.'"), quoting *Reynolds v. Jamison*, 488 F.3d 756, 762 (7th Cir. 2007). This is especially true where suspects exhibit "evasive and deceptive" behavior, as both Washington and Howard had by lying in their

initial interrogations. *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006).

Plaintiffs make much of the detectives' statements in Washington's interrogation that she "couldn't have done" the "damage that was done to [Edmondson's] head," and that they did not believe Washington was "strong enough to do the damage that [Edmondson] … sustained." The state was not required to prove as an element of the charges whether Washington or Howard dealt the fatal blow; either or both of them could be convicted under a theory of felony murder. Second, the interrogators' statements occurred in an attempt to lead Washington to reveal the identity of the third person involved in the altercation. Law enforcement officers are not bound to be truthful when trying to elicit information, including the identities of others involved in the offense. *Johnson v. Pollard*, 559 F.3d 746, 754 (7th Cir. 2009) ("The fact that an officer misrepresents the strength of the evidence against a defendant is insufficient, standing alone" to render a resulting confession unreliable). Indeed, the detectives' interrogation on this point was fruitful. Washington eventually told the detectives that Howard hit Edmondson on the back of the head.

It is true that Washington later retracted this statement while being questioned by ASA Waller. But neither ASA Waller nor the detectives were obliged to believe Washington's recantation. See *Spiegel v. Cortese*, 196 F.3d 717, 724 (7th Cir. 1999) ("Many putative defendants protest their innocence, and it is not the responsibility of law enforcement officials to test such claims once probable cause has been established."); see also *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016) (summarizing *Sang Ken Kim v. City of Chicago*, 858 N.E.2d 569, 578–79 (Ill. App. 2006), as a case "affirming summary

judgment because probable cause existed at time of arrest despite later recantation of accusation and allegedly coercive interrogation").

We recognize that some facts known to detectives at the time weighed against a conclusion that Washington and Howard committed the murder. Washington is physically small in stature, and the pipe recovered from her home was a lightweight silver pole one inch in diameter originally thought to be a table leg but later identified as part of a feeding tube machine for her children. None of the parking-lot witnesses said that they had seen any blood coming from what must have been a serious wound on the back of Edmondson's head, even when he turned and walked away from them. And Edmondson had been able to maintain a conversation with those witnesses, describing to them the altercation that had just occurred. There is also security footage showing Edmondson walking half a mile after his altercation with the plaintiffs without any visible distress or blood. We assume for purposes of summary judgment that the detectives had access to that video before plaintiffs' probable cause hearings.

These serious factual discrepancies contributed heavily to plaintiffs' eventual acquittal, and for good reason. But probable cause demands much less than proof beyond a reasonable doubt. *United States v. Bullock*, 632 F.3d 1004, 1022 (7th Cir. 2011) (probable cause determination "does not require evidence sufficient to support a conviction, nor even evidence that it is more likely than not that the suspect committed a crime" (internal citation omitted)). Probable cause existed as a matter of law even when we give the plaintiffs the benefit of factual disputes.

Plaintiffs rely on other cases finding a lack of probable cause to support pretrial detention, but they are distinguishable. *Hurt v. Wise* is a post-*Manuel I* case reversing a grant of summary judgment on a wrongful pretrial detention claim. 880 F.3d 831 (7th Cir. 2018), overruled on other grounds by *Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019). In *Hurt*, the "*only* source of probable cause" to arrest and detain the plaintiff was his supposed confession, "so everything turn[ed] on it." 880 F.3d at 837 (emphasis in original). But the supposed confession was "replete with easily verified and contemporaneous evidence of inaccuracy and unreliability." *Id.* "Several critical 'facts' that [plaintiff] offered were facially impossible. For example, if [plaintiff's] account of where he and his siblings had dumped [the victim's] body … was true, the body would have had to float *upstream* four to six miles to have arrived at the location where it was found." *Id.* (emphasis in original). This, plus other facts in the confession that were plainly contradicted by physical or documentary evidence, led us to conclude that probable cause could not be established as a matter of law. *Id.* at 841–42.

In another post-*Manuel I* case, *Rainsberger v. Benner*, we again found that probable cause could not be resolved as a matter of law, affirming a denial of qualified immunity on a standard of review identical to that for summary judgment. 913 F.3d at 643. There, the defendant Officer Benner had filed a probable cause affidavit for the arrest of plaintiff Rainsberger on the theory that he murdered his mother, Ruth. After charges were dropped against Rainsberger, he filed a section 1983 suit alleging that Officer Benner had lied in his affidavit. In our analysis, we "eliminate[d] the alleged false statements, incorporate[d] any allegedly omitted facts, and then evaluate[d] whether the resulting 'hypothetical' affidavit

would establish probable cause." *Id.* at 647, quoting *Betker v. Gomez*, 692 F.3d 854, 862 (7th Cir. 2012). We said that the remaining "package of facts" supporting probable cause boiled down to these:

> Ruth's murderer might have been someone she knew, because the attack was not necessarily connected to a burglary. Some drawers had been opened and her purse and medication were missing; at the same time, there was no sign of a forced entry, and Ruth's checkbook, credit cards, and some cash were still in the apartment. Rainsberger had a key to her apartment, and cell phone records did not rule out the possibility that he was in the vicinity of her apartment complex when the attack happened. Shortly before he found his mother and called 911, Rainsberger stopped at a Kroger across the street from his mother's apartment to buy an iced tea. He walked in plain view through the Kroger parking lot carrying a piece of trash, which he threw away in a receptacle by a Redbox machine on his way into the store. He correctly described Ruth's injury as a blow to the head, even though he had not removed the blanket to see the wound. In contrast, the first responder, who did remove the blanket, initially thought that Ruth had been shot. Rainsberger and his two siblings would inherit about $33,000 apiece if his mother died. When Benner brought the Rainsberger children to the police station under false pretenses, Rainsberger and his brother refused Benner's request that they

> take a polygraph test. A week later, they volun-
> tarily gave fingerprints and submitted to a DNA
> buccal swab.

*Rainsberger*, 913 F.3d at 648.

Many of these facts, we noted, "would be true of most chil-
dren of aging parents …. These unremarkable facts would be
reason to suspect Rainsberger only if other information cast
them in a suspicious light." *Id*. But "[t]he totality of these cir-
cumstances support[ed] nothing more than bare suspi-
cion…." *Id.* at 649. "If probable cause exists here, then anyone
who experiences the tragedy of discovering a murdered fam-
ily member—and who correctly assesses the cause of the in-
jury and recently threw something away in a public trash
can—can be arrested for murder. Probable cause is a low bar,
but this evidence does not clear it." *Id.*

*Hurt* and *Rainsberger* look nothing like the bundle of facts
that remain to support probable cause to detain Washington
and Howard, even with the purported "lies stripped and the
omissions added." *Id.* at 648. Washington's admission that
both plaintiffs were involved in a physical altercation with the
victim and had struck him with fists and a metal pole shortly
before he was found dead are hardly "unremarkable facts"
requiring "other information [to] cast them in a suspicious
light." *Id.* Nor would a belief that Washington and Howard
killed Edmondson contradict the laws of nature, as in *Hurt*.
See 880 F.3d at 837. The defendant detectives had no evidence
that anyone else had encountered Edmondson between the
altercation and his death, except for the parking-lot witnesses
who reported open wounds on Edmondson's face and chest.
Prior to arrest and during initial questioning, Washington and
Howard were evasive and deceptive toward the detectives.

And even if the detectives did not believe Washington alone was capable of dealing the fatal blow, the charged felony-murder theory did not require that she did.

Consequently, after eliminating the alleged misrepresentations and adding in the omissions, undisputed facts show that probable cause would have still existed to detain Washington and Howard pending their trials. No reasonable jury could conclude otherwise. Thus, even if we assume that the prosecutors, judges, and grand jury relied on the asserted false statements and omissions by the defendant detectives, Washington and Howard cannot show that such false statements were "necessary" to the judicial determinations of probable cause as required to overcome the presumption of validity. *Beauchamp*, 320 F.3d at 742–43. Consequently, the judicial determinations of probable cause are presumed to be valid, and the pretrial detention of Washington and Howard did not violate the Fourth Amendment. *Manuel I*, 580 U.S. at 367.

D. *Malicious Prosecution Claim*

Plaintiffs' claims for malicious prosecution fail for the same reason that their Fourth Amendment claims fail—the detectives and courts had probable cause to detain them. See *Young*, 987 F.3d at 646, citing *Martinez v. City of Chicago*, 900 F.3d 838, 849 (7th Cir. 2018) ("To state a claim for malicious prosecution under Illinois law, a plaintiff must allege that: (1) he was subjected to judicial proceedings; (2) for which there was no probable cause…."). Because plaintiffs' pretrial detention was supported by probable cause based on the prosecutors' independent fact-gathering and even if the purported lies and omissions are accepted as true, the district

court properly granted summary judgment on their malicious prosecution claims.

The district court's grant of summary judgment to defendants is AFFIRMED.